IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVISON DESIGN & DEVELOPMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| MARIO SCORZA, | ) | |
| | ) | |
| Defendant. | ) | |

**Exhibit 5**

**March 3, 2023 Respondent's Response to
Claimant's Fee Petition and Post-Hearing Brief**

IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| MARIO SCORZA, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | )   No. 01-21-0004-6369 |
| | ) |
| DAVISON DESIGN AND | ) |
| DEVELOPMENT, INC., | ) |
| | ) |
| Respondent. | ) |

## RESPONDENT'S RESPONSE TO CLAIMANT'S
## FEE PETITION AND POST-HEARING BRIEF

Respondent Davison Design and Development, Inc. ("Davison") submits this Response to Claimant Mario Scorza's ("Scorza") Fee Petition and Post-Hearing Brief.

## I.      RESPONSE TO FEE PETITION

In his February 15, 2023 Application for Fees and Costs (the "Fee Request"), Scorza identifies the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") as the sole legal basis for his fee request. Fee Request at 1-2. Scorza seeks fees and costs totaling $224,024.05, which consists of a "projected" $159,898.50 in attorneys' fees and $64,125.55 in "arbitration related costs." *Id.*, Ex. 1 ¶¶ 16-20 (Affidavit of Stacey L. Barnes, Esq.).

There is no legal basis under the UTPCPL to award Scorza any of his attorneys' fees and costs; and even if there were any legal basis, the fees and costs Scorza seeks are unreasonable. Accordingly, Scorza's Fee Request should be denied.

## A.      There Is No Legal Basis to Award Scorza Attorneys' Fees and Costs

Scorza cannot assert a claim under the UTPCPL because he purchased services from Davison for business purposes, not "primarily for personal, family, or household purposes." *See* 73 P.S. § 201-9.2(a); Parts III-IV of Davison's May 16, 2022 Pre-Hearing Brief (attached

hereto as Exhibit 1); *Niiaryee v. Davison Design & Dev., Inc.*, No. 17-1225, 2018 WL 1072439, at *4 (W.D. Pa. Feb. 27, 2018) (dismissing UTPCPL claim on this basis because "Plaintiff allege[d] that he purchased Defendant's services in order to bring his invention to the market[,]" and because the parties' agreements said his purchase was for business purposes, as Scorza acknowledged in his agreements); *Travis v. State Auto Mut. Ins. Co.*, No. 21-5395, 2023 WL 2163975, at *5 (E.D. Pa. Feb. 22, 2023) (dismissing UTPCPL claim on this basis, relying on same cases cited in Davison's Pre-Hearing Brief for the commercial/investment vs. personal purpose distinction). Because he cannot prevail on his UTPCPL claim, Scorza's claim for attorneys' fees and costs fails. *See* 73 P.S. § 201-9.2(a).

The evidence adduced at the hearing confirms that Scorza purchased services from Davison for business/commercial reasons. Mr. Scorza's contemporaneous communications with Davison,[1] the contracts he signed,[2] and his testimony at the hearing show he wanted to commercialize his idea and to see his product on shelves at stores like Bed Bath & Beyond. Because Scorza purchased services from Davison for business/investment/commercial purposes, he cannot assert a UTPCPL claim, and any claim for attorneys' fees thereunder also fails. *See* 73 P.S. § 201-9.2(a); *Niiaryee*, 2018 WL 1072439, at *4.

Scorza's cites AAA Rules R-47(d)(ii) and R-54,[3] but those Rules provide no basis to award him the fees and costs he seeks. The former Rule applies only where, as relevant

---

[1] Ex. R-2 (ISA) at Davison_68 ("There are NO scales on the market . . . ."); Ex. C-30 at Scorza40 (Mar. 12, 2019 email), Scorza44 (June 15, 2018 email), Scorza 57 (Nov. 11, 2018 email), Scorza55 (Mar. 14, 2019 email), Scorza56 (Apr. 1, 2019 email), Scorza61 (Aug. 19, 2020 email).

[2] Ex. R-3 (Pre-Development and Representation Agreement) § III.F; Ex. R-7 (New Product Sample Agreement) § 4.P; Ex. R-16 (Multiple Company Campaign Agreement) § C.4.d; Ex. R-17 (Inventomercial Presentation Agreement) § C.iv.

[3] The AAA's Commercial Rules were amended effective September 1, 2022. Scorza cites the pre-amendment Rules. The post-amendment Rules, which are the same in all relevant respects as the pre-amendment Rules, are Rules R-49(d)(ii) and R-56, respectively.

here, "an award of attorneys' fees . . . is authorized by law or the parties' arbitration agreement." As just demonstrated, attorneys' fees are not "authorized by law" or "the parties' arbitration agreement[s]." The latter Rules concerns "expenses of the arbitration," which does not include the fees or costs Scorza seeks here.

Because there is no "express statutory authorization, a clear agreement of the parties[,] or some other established exception[]" to the American Rule, that Rule prevails, and Scorza's claim for attorneys' fees and costs therefore fails as a matter of law. *See McMullen v. Kutz*, 985 A.2d 769, 775-76 (Pa. 2009).

**B.      The Requested Fees Are Unreasonable**

Putting aside the absence of any legal basis to award fees and costs, the amount of fees and costs that Scorza seeks is unreasonable. *See* 73 P.S. § 201-9.2(a) (allowing court an award of "costs and reasonable attorney fees"). There are several problems with Scorza's Fee Request, each establishing its unreasonableness.

**1.      Scorza's Fee Request Is Disproportionate to Any Damages Amount**

Under the UTPCPL, "there must be a sense of proportionality between an award of damages and an award of attorney's fees." *Skurnowicz v. Lucci*, 798 A.2d 788, 796 (Pa. Super. 2002), *superseded by statute on other grounds, as recognized in Milliken v. Jacono*, 60 A.3d 133 (Pa. Super. 2012); *McCauslin v. Reliance Fin. Co.*, 751 A.2d 683, 686 (Pa. Super. 2000). "[T]here is no indication th[e fee-shifting provision] was intended to provide a claimant, or his attorney, with a windfall or bonanza should he or she be successful." *McCauslin*, 751 A.2d at 686.

"Where the court awards attorney fees that exceed twice the amount of damages, a question is certainly raised whether the fee award was reasonable or not." *Skurnowicz*, 798 A.2d at 796; *see McCauslin*, 751 A.2d at 686.

Here, as argued in Part II.B below, the only evidence Scorza presented regarding his "damages" is the $20,042.25 he paid to Davison pursuant to the parties' four agreements.[4] It is simply not reasonable and proportionate for Scorza's counsel to seek $224,024.05 in fees and costs when Scorza paid only $20,042.25 for Davison's services, and the parties' agreements expressly limited damages to the amount Scorza paid to Davison.[5] *See Skurnowicz*, 798 A.2d at 796; *McCauslin*, 751 A.2d at 686.

## 2.     Scorza Failed to Properly Support His Fee Request

Scorza "has the burden to prove that [his fee] request is reasonable." *Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 400 (3d Cir. 2018).[6] "To meet [his] burden, the fee petitioner must submit evidence supporting the rates claimed, consisting of satisfactory evidence, ***in addition to the attorney's own affidavits***, that the requested hourly rates meet the[ applicable] standard." *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 506-07 (M.D. Pa. 2016) (emphasis added) (citations omitted). "An attorney's showing of reasonableness must rest on evidence ***other than the attorney's own affidavits***." *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 595 (3d Cir. 2000) (emphasis added) (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 n.11 (1984)); *see Clemens*, 903 F.3d at 402. Where "billing attorneys d[o] not even submit their own affidavits identifying their usual billing rates or

---

[4] Davison is not conceding that Scorza proved any of his causes of action, that he suffered any compensable damages, or that the $20,042.25 he paid to Davison is a proper measure of damages. The point here is only that the $224,024.05 in fees and costs Scorza seeks is out of all proportion to the only conceivable potential damages amount presented at the hearing.

[5] Ex. R-7 (New Product Sample Agreement) § 4.N; Ex. R-16 (Multiple Company Campaign Agreement) § C.4.b; Ex. R-17 (Inventomercial Presentation Agreement) § C.ii.

[6] Pennsylvania state and federal courts construing Pennsylvania fee-shifting statutes rely upon federal decisions construing federal fee-shifting statutes. *See, e.g.*, *Clemens*, 903 F.3d at 399-400 & n.4 (noting that "decisions involving similar federal statutes are germane to our analysis[]" of the Pennsylvania bad-faith fee-shifting statute); *Birth Ctr. v. St. Paul Cos.*, 727 A.2d 1144, 1160-61 (looking to federal decisions in construing the same bad-faith statute at issue in *Clemens*). Davison will do the same.

4

describing their levels of experience," it is "within the court's discretion" to "disallow any hours billed by those [] lawyers" because they "provided no information whatsoever on which [the court] could make a determination as to whether the requested hourly rate was reasonable." *Clemens*, 903 F.3d at 402.

The Fee Request suffers from these same defects. ***First***, there is nothing "other than [one] attorney's own affidavit[]" attached to the Fee Request.[7] *See Clemens*, 903 F.3d at 402. It is supported only by Mr. Barnes' Affidavit—nothing more, such as affidavits from other attorneys in the community or other documents supporting the claimed "reasonable" rates they seek. *See, e.g., Borrell*, 207 F. Supp. 3d at 506-07.

***Second***, only Mr. Barnes submitted an affidavit in support of the Fee Request,[8] and only Mr. Barnes' CV is attached to the Fee Request[9]— despite that the Fee Request seeks to recover fees charged by three additional attorneys (William Yarbrough, Bradley Nevills, and Vikesh Patel) and four non-attorneys (Marisol Contreras, Harrison Long, Andrea Cavazos, Shannon V. Frizzell, and Vikesh Patel).[10] So aside from Mr. Barnes' unsupported assertion that their claimed rates are "comparable to the prevailing market rates" in both "Houston and Pittsburg [sic]" and so allegedly reasonable,[11] there is simply nothing in the record to sustain Scorza's burden that the rates requested are reasonable. *See Clemens*, 903 F.3d at 402; *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 131 (3d Cir. 1999) ("A district

---

[7] Fee Request at 1, Part I (Materials Submitted); *id.*, Ex. 1 (Mr. Barnes' 5-page Affidavit); *id.*, Ex. 2 (Mr. Barnes' 6-page CV); *id.*, Ex. 3 (invoices).

[8] Fee Request at 1, Part I (Materials Submitted); *id.*, Ex. 1.

[9] Fee Request at 1, Part I (Materials Submitted); *id.*, Ex. 2.

[10] Through April 2022, Mr. Patel's time was billed at $100 per hour. Between May 2022 and October 2022, his time was billed at $125 per hour. In November-December 2022, his time was billed at $215 per hour.

[11] Fee Request, Ex. 1, ¶ 13.

court may not set attorneys' fees based upon a generalized sense of what is customary and proper, but rather *must* rely upon the record.") (emphasis in original) (citation omitted).

    ***Third***, Scorza did not submit ***any*** invoices/timesheets for the "[p]ending and unbilled charges including January and February and the [h]earing on the [m]erits"—yet he seeks $79,440.50 in fees for those two months of work, which represents almost one-half of the total $159,898.50 in fees requested.[12] The same is true with respect to the "project[ed] fees for the preparation of th[e] fee application, and for post-[h]earing briefing," for which Scorza seeks $19,450.00.[13] There is simply no support or record evidence whatsoever for Davison to challenge, or for the Arbitrator to determine, the reasonableness of those fees. *See Evans v. Port Authority of N.Y. & N.J.*, 273 F.3d 346, 361 (3d Cir. 2001) (noting "attorneys seeking fees must document the hours for which payment is sought with sufficient specificity to allow the [d]istrict [c]ourt to determine whether the hours claims are unreasonable for the work performed") (citing and quoting *Washington v. Phila. Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996)); *see also, e.g.*, *Clemens*, 903 F.3d at 402.

### 3.    Scorza's Fee Request Includes Redundant and Excessive Time

    "When a party submits a fee petition, it is not the opening bid in the quest for an award. Rather, it is the duty of the requesting party to make a good faith effort to exclude hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Clemens*, 903 F.3d at 403 (cleaned up).

    Scorza's counsel over-staffed this case with two lawyers (Messrs. William Yarbrough and Stacey Barnes) who charged the same rates ($400/hour through December 2021 and

---

[12] Fee Request, Ex. 1, ¶ 16.

[13] Fee Request, Ex. 1, ¶ 16.

$425/hour through December 2022) for the same tasks. In fact, beginning in December 2022, they staffed this case with *three* lawyers (Messrs. Yarbrough and Barnes, and Mr. Vikesh Patel), two of whom continued to bill at the same rate for the same tasks.

Below are the most obvious examples of Messrs. Yarbrough and Barnes duplicating tasks and billing their time at the same $400/$425 hourly rate:

- In September 2021, both Mr. Yarbrough and Mr. Barnes billed for reviewing the list of arbitrators and preparing a ranked list of arbitrators.

- Both participated in and billed similar amounts of time (0.8 and 1.4 hours) for an October 1, 2021 preliminary hearing call with the Arbitrator.

- Both participated in and billed similar amounts of time (0.5 and 1.1 hours) for a December 13, 2021 status conference call with the Arbitrator.

- Both billed similar amounts of time for the same tasks on March 9 and 15, 2022 regarding an expert report.

- Both billed similar amounts of time for the same tasks on April 23, April 25, and May 10, 2022 regarding an expert report.

- Both billed similar amounts of time for the same tasks on May 20, May 21, May 23, and May 24, 2022 regarding Scorza's Pre-Hearing Brief.

- Both billed similar amounts of time for the same tasks on December 7, December 16, and December 17, 2022 regarding an expert report.

- Both billed similar amounts of time for the same tasks on December 20 and 21, 2022 regarding mediation.

Mr. Patel had similar billing entries on December 7, 17, 20, and 21, 2022, so at those times, there were *three* attorneys billing for the same tasks on this one case. The unreasonableness of their staffing decisions and their resultant excessive billings are most evident from the December 20-21, 2022 entries regarding the mediation session—they billed Mr. Scorza 30.8 hours, totaling $11,620.00, for those two days alone.

Given Mr. Barnes' "professed expertise, it would not have been unreasonable to expect that [he] would have been able to handle most aspects of this matter, *including* the

trial alone or with the help of an associate." *Evans*, 273 F.3d at 362 (emphasis in original) (cleaned up) (quoting *Lanni v. New Jersey*, 259  F.3d 146, 151 (3d Cir. 2001)). Instead, Scorza's counsel staffed this case in which Scorza paid Davison less than $25,000 with two senior attorneys who billed at the same hourly rate for performing largely the same tasks. That is simply not reasonable. *See id.*; *McCauslin*, 751 A.2d at 686 (noting the UTPCPL fee-shifting provision is not intended to be a "windfall or bonanza" for plaintiffs or attorneys).

In sum, because Scorza has no viable UTPCPL claim, he cannot recover any fees and costs thereunder, which is his only asserted basis for recovering fees and costs. That legal impediment aside, the fees and costs Scorza seeks are unreasonable and so should be rejected for the numerous reasons set forth above.

## II.     POST-HEARING BRIEF

### A.     Scorza's "Lost Patent Rights" Theory of Liability Fails

Scorza's theory of liability is based upon the faulty premise that his patent rights in his Trava Weigh invention are "irremediabl[y] los[t]."[14] Mr. McBride's report did not state the reasons underlying this conclusion. At the hearing, however, Mr. McBride opined that Scorza's patent rights were gone/lost by operation of the "on-sale" bar codified in Section 102 of the Patent Act, 35 U.S.C. § 102. Mr. McBride testified at the hearing that Davison seeking a licensee for Scorza's invention was an "offer of sale" that started the one-year on-sale time-bar clock running or, alternatively, that clock started running when Davison created drawings for the manufacture of the invention, which in his opinion constituted a "reduction to practice."

Mr. McBride's opinions are contrary to the law and the facts and, thus, do not support liability on this theory.

---

[14] Ex. C-1 (McBride Report) at 6 (unnumbered).

"The on-sale bar prohibits the patenting of an invention that has been the subject of an offer for sale before [the] critical date in § 102(b). In applying the statutory on-sale bar, th[e Federal Circuit] follows the test set forth in *Pfaff* [*v. Wells Elecs., Inc.*, 525 U.S. 55 (1998)]. The *Pfaff* test requires that (1) the invention be the subject of a ***commercial sale or offer for sale***[,] and (2) the invention be 'ready for patenting' at the time of the offer or sale." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 996 (Fed. Cir. 2007) (emphasis added) (citations omitted). So "[t]he on-sale bar applies when [these] two conditions are satisfied before the critical date[.] . . ." *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1374-75 (Fed. Cir. 2013).

Under the first prong of the *Pfaff* test,[15] "[a]n actual sale is not required for the activity to be an invalidating commercial offer for sale. An attempt to sell is sufficient so long as it is sufficiently definite that another party could make a binding contract by simple acceptance." *Hamilton Beach*, 726 F.3d at 1374-75. "[W]hen no actual sale is present, only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), triggers the on-sale bar." *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1365 (Fed. Cir. 2016).

"It is well-settled that mere preparations for commercial sales are not themselves 'commercial sales' or 'commercial offers for sale' under the on-sale bar." *Id.* at 1377-78. "Indeed, [the Federal Circuit] ha[s] held that an inventor that has publicized that a product will soon be placed on sale has not created an offer that another party could make binding by simple acceptance." *Id.*

---

[15] The Patent Act, including Section 102, was amended in 2011 by the America Invents Act. *See Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 139 S. Ct. 628, 630 (2019). The Supreme Court has held that the AIA did not alter the well-established meaning of the on-sale bar, and that case law construing the pre-AIA on-sale bar, including *Pfaff*, continues to apply post-AIA. *See id.* at 630, 633-34.

9

The Federal Circuit has also "held that merely granting a license to an invention, without more, does not trigger the on-sale bar of § 102(b)." *In re Kollar*, 286 F.3d 1326, 1330-31 (Fed. Cir. 2002) (citing *Mas-Hamilton Group v. LeGard, Inc.*, 156 F.3d 1206, 1217 (Fed. Cir. 1998), and *Moleculon Res. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed. Cir. 1986)). "[T]he offer of a license under a patent and a description of the invention, without more, does not fall within the on-sale bar of § 102(b)." *Id.* at 1332; *see also, e.g.*, *Elan Corp. v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004) ("An offer to enter into a license under a patent for future sale of the invention covered by the patent when and if it has been developed[] . . . is not an offer to sell the patented invention that constitutes an on-sale bar.") (citing *Kollar*, 286 F.3d at 1331).

Thus, "an assignment or sale of the rights in the invention and potential patent rights is not a sale of the invention within the meaning of section 102(b)." *Moleculon*, 792 F.2d at 1267; *Kollar*, 286 F.3d at 1330-31 & n.3 (distinguishing licenses which trigger the on-sale bar (*e.g.*, standard computer software license wherein the product is just as immediately transferred to the licensee as if it were sold) from licenses that "merely grant[] rights" to an invention, which "cannot *per se* trigger the application of the on-sale bar").

The "reduction to practice" analysis applies only to the second prong of the *Pfaff* test (the invention is "ready for patenting"), and it is one of two ways that prong can be met. *See Honeywell*, 488 F.3d at 997. If there has been no commercial sale or offer for sale, the first prong of the disjunctive *Pfaff* test has not been met, and there is no need to consider the second prong. *See id.*; *Hamilton Beach*, 726 F.3d at 1374-75.

There was clearly no commercial sale or offer for sale here, so the first *Pfaff* prong was never met, and the on-sale bar was never triggered. There was never a commercial sale of Scorza's invention. Indeed, Mr. McBride couched his testimony in terms of Davison's acts

constituting an "offer for sale." However, as the above well-established case law holds, Davison's acts in presenting Scorza's invention to third parties to evaluate for potential licensing does ***not*** constitute a commercial offer for sale as a matter of law. *See Kollar*, 286 F.3d at 1330-31 & n.3; *Elan Corp.*, 366 F.3d at 1341; *Moleculon*, 792 F.2d at 1267.

Under the Multiple Company Campaign Agreement,[16] Davison agreed to submit Scorza's "Invention for licensing consideration" to up to 45 corporate targets, which included registered target companies (those "that have previously agreed to review product ideas confidentially from Davison") and non-registered target companies (those "that have not previously agreed to confidentially review product ideas from Davison"). Registered companies were those that had signed the "We Mass-Produce New Product Development" form at page 2 of Ex. R-19, R-20, and R-21. By signing that form, registered target companies indicated their interest in "review[ing] product design literature or samples," agreed to treat that information "as confidential and proprietary information[,]" and understood that "before [they] may use the design information, [they] will negotiate with us and enter into a license agreement." No terms of any potential license were included in the registration form.[17]

As for non-registered target companies, Davison sent a cover letter including the "teaser paragraph" describing Scorza's invention and a blank registration form. The cover letter stated, among other things, that in order to release confidential information regarding Scorza's invention, the non-registered target company had to return the

---

[16] Ex. R-16 at Davison_323, § A.1-4.

[17] Ex. R-19 at 2 (language below signature lines); Ex. R-20 at 2 (same); Ex. R-21 at 2 (same).

registration form. No terms of any potential license agreement were included in the cover letter or the attached blank registration form.[18]

Davison therefore did not make a definite offer for sale of Scorza's invention. Davison did not set forth any terms, let alone definite terms, of a potential future license agreement regarding Scorza's invention, so there was not even an offer of a license of Scorza's invention idea. In any event, an offer to license an idea or a patent does not trigger the first *Pfaff* prong of the on-sale bar as a matter of law. *See Kollar*, 286 F.3d at 1330-31 & n.3; *Elan Corp.*, 366 F.3d at 1341; *Moleculon*, 792 F.2d at 1267. It thus follows that Davison's actions preceding and preparatory to any such potential license cannot trigger that prong. *See id.* Davison's "mere preparations for [potential] commercial sales" do not constitute offers for sale under Section 102(b). *Medicines Co.*, 827 F.3d at 1377-78.

Scorza's patent rights were and are not barred by the on-sale bar because there has been no commercial sale or offer for sale, so the on-sale bar was never triggered. *See* 35 U.S.C. § 102(b); *Kollar*, 286 F.3d at 1330-31 & n.3; *Elan Corp.*, 366 F.3d at 1341; *Moleculon*, 792 F.2d at 1267. Mr. McBride's opinion that Davison's acts triggered the on-sale bar such that Scorza's patent rights in his idea are "irremediabl[y] los[t]" is contrary to well-established law and the facts of record. His opinions are unreliable and so should be rejected.[19] Scorza's theory of liability on his alleged lost profits rights therefore fails.

---

[18] Ex. R-19 at 1-2; Ex. R-20 at 1-2; Ex. R-21 at 1-2.

[19] Mr. McBride's testimony that one of Davison's renderings created legal liability for "false marking" is a spurious red herring and should also be rejected as unreliable.

The false marking statute, 35 U.S.C. § 292, requires that the false marking be made "for the purpose of deceiving the public[,]" so it applies only where the article on which the mark was made was marketed to the public. *See* 35 U.S.C. § 292(a); *Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1399-1401 & n.4 (Fed. Cir. 2015); *Forest Group, Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1302-03 (Fed. Cir. 2009) ("The marking and false marking statutes exist to give **the public** notice of patent rights. Congress intended **the public** to rely on marking as a ready means of discerning the status of intellectual property embodied in an article of

**B.**     **Scorza Presented No Evidence of Any Amount of Monetary Damages Stemming from His Alleged Lost Patent Rights**

There is another fatal defect in Scorza's theory premised on his alleged "lost" patent rights: he presented no evidence establishing the amount of monetary damages he purportedly suffered due to those alleged lost rights.

Scorza has the burden to prove the amount of damages he allegedly suffered. "To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.' At a minimum, reasonable certainty embraces a rough calculation that it not 'too speculative, vague or contingent' upon some unknown factor." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) (citations omitted). "[S]ufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture." *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1257-58 (Pa. Super. 1983) (citations omitted). A "fact-finder may not render a verdict based on sheer conjecture or guesswork[.] . . ." *Discover Bank v. Booker*, 259 A.3d 493, 497 (Pa. Super. 2021) (quoting *Judge Tech. Servs., Inc. v. Clancy*, 813 A.2d 879, 885 (Pa. Super. 2002)).

Scorza offered no evidence from which the claimed damages stemming from his alleged lost patent rights can be calculated to any reasonable certainty. Scorza himself testified that he is not familiar with or an expert in patent rights or issues. Mr. McBride,

---

manufacture or design. Acts of false making deter innovation and stifle competition ***in the marketplace***. If an article that is ***within the public domain*** is falsely marked, potential competitors may be dissuaded from entering the same market.") (emphases added). Neither the Davison rendering Mr. McBride pointed to, nor any other article on which "patent pending" appeared, was marketed to the public, within the public domain, or in the marketplace, so the false marking statute does not apply.

Mr. McBride's testimony that anyone (including the "false market trolls" he referenced) can bring suit for false marketing is also incorrect. Congress addressed and closed that loophole in 2011 so that only competitors who suffer competitive injury as a result of a statutory violation can sue under the statute. *See Sukumar*, 785 F.3d at 1400-01 & nn.3-4 (discussing legislative history of 2011 amendments to § 292).

Scorza's expert on patent law issues, was not qualified to opine on, and thus did not opine on, any damages issues.

Dr. Kenneth Lehrer, Scorza's damages expert, did not provide an opinion on any actual damages Scorza allegedly sustained due to his lost patent rights. The most Dr. Lehrer did in his March 2022 report and his testimony at the hearing was to provide the following basic economic concept: "The value of the firm is the present value of the firm's expected future net cash flows. If cash flows are equated to profits for simplicity, the value of the firm today, or its present value[,] is the value of expected profits or cash flows, discounted back to the present at an appropriate interest rate."[20] But nowhere in his March 2022 report or in his hearing testimony did Dr. Lehrer provide any quantification of the amount of damages Scorza allegedly suffered because of his alleged lost patent rights. *See id.* at 1-16; *see also* Jan. 17, 2023 Preliminary Hearing & Scheduling Order #8 (noting "Dr. Lehrer's original report did not include any estimated damages figures").

In the absence of any evidence quantifying the alleged lost patent rights damages figure, it would be "sheer conjecture or guesswork" to award Scorza such damages. *See Delahanty*, 464 A.2d at 1257-58; *Discover Bank*, 259 A.3d at 497; *Ware*, 322 F.3d at 226. Scorza has failed to carry his burden of proof as to damages, so his claims fail.

**C.      Scorza Failed to Prove a Breach of Contract**

Scorza's first claim for breach of contract fails. *See* Demand for Arb. Part IV.A. Scorza's theory at the hearing was that Davison breached the contracts by failing to do more to ensure his patent applications were completed correctly, such as by advising him to consult a patent practitioner. That cannot be and is not a breach of the parties' contracts given their express terms.

---

[20] Ex. C-2 (Dr. Lehrer's March 2022 report) at 8.

Scorza had the burden to establish by the following: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Discover Bank*, 259 A.3d at 495 (cleaned up). Scorza cannot establish elements (2) or (3). (Scorza's failure to prove element (3) is addressed above in Part II.B and will not be addressed further herein.)

"It is old, settled law that persons may alter by express agreement the legal relationship they would normally have had by operation of law." *Ress v. Barent*, 548 A.2d 1259, 1265 (Pa. Super. 1988) (citation omitted). "[W]here the parties have chosen to address a particular aspect of their relationship by contract, it is the writing itself that is to determine the rights and liabilities of the parties." *Id.* (citation omitted).

"[P]arties have the right to make their own contract, and it is not the function of [a c]ourt to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used." *Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.*, 217 A.3d 1227, 1238 (Pa. 2019) (citing *Amoco Oil Co. v. Snyder*, 478 A.2d 795, 798 (Pa. 1984)). "Pennsylvania affords parties broad latitude in fashioning their agreements. As part of that flexibility, a voluntarily-agreed-to contract term is enforceable unless a statute or the common law specifically prevents enforcement of that term." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 219-20 (3d Cir. 2022) (citations omitted). "It is not the province of the court to alter by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly." *Amoco Oil*, 478 A.2d at 798.

As part of the Pre-Development and Representation Agreement packet, Davison advised Scorza: "YOU ARE ENCOURAGED TO CONSULT WITH A QUALIFIED ATTORNEY BEFORE SIGNING THIS CONTRACT. BY PROCEEDING WITHOUT THE

ADVICE OF A QUALIFIED ATTORNEY, YOU COULD LOSE ANY RIGHTS YOU MIGHT

HAVE IN YOUR IDEA OR INVENTION."[21] In Section I.B.6 of that Agreement, the parties

agreed that "[Scorza] is solely responsible for the sufficiency and complete-ness of any

[provisional patent] application and supporting documents[,]" and that "Davison will not

perform any review or correction of any documents provided by [Scorza]."[22] Section III.D of

that Agreement stated: "Except as described in paragraph I.B.6, Davison is not responsible

for applying for, assisting with, or obtaining any intellectual property protections on the

Product or Design, including but not limited to patents, trademarks and trade names."[23]

Scorza e-signed this Agreement on January 12, 2017,[24] and he paid the $795 consideration

by February 17, 2017.[25]

Similar language appeared in the parties' New Product Sample Agreement.[26]

Davison "provide[d] descriptive information that [Scorza] may find useful in filing a"

provisional patent application. Scorza acknowledged he was "solely responsible for the

sufficiency, completion and submission of any final application, [USPTO] form PTO/SB/16,

or any other patent or trademark applications that may be necessary."[27] Scorza also

acknowledged that:

> [o]nly official government agencies can award a patent, trademark and/or
> copyright. Davison is not a law firm. Davison is not providing, and [Scorza] is
> not relying upon Davison for, legal advice. [Scorza] acknowledged that he/she

---

[21] Ex. R-3 at Davison_330.

[22] Ex. R-3 at Davison_332, § I.B.6 (Provisional Application for Patent Filing Payment).

[23] Ex. R-3 at Davison_334, § III.D (Disclaimers).

[24] Ex. R-3 at Davison_339.

[25] Ex. R-24 at Davison_70, 75; Ex. C-27 at Scorza24-25; Ex. C-28 at Scorza26.

[26] Ex. R-7.

[27] Ex. R-7 at Davison_21, § 1.F (Information for Provisional Patent Application).

is responsible for patenting his/her Idea and that Davison has made no representations concerning the patentability of the Idea or its ultimate design.[28]

Through these contract provisions, Davison did advise Scorza several times to seek legal counsel regarding any intellectual property rights he may have in his invention idea, including but not limited to any patent rights. The parties also agreed that Scorza was solely responsible for ensuring that his provisional patent paperwork was sufficient and complete. The parties expressly and repeatedly agreed that Davison would provide Scorza forms and information for use in connection with a provisional patent application. But they also agreed that Davison assumed no duties with respect to the sufficiency or completeness of any provisional patent application; those duties were Scorza's responsibility alone. Given the above case law, the contrary testimony and statements from Scorza, his counsel, or Mr. McBride cannot change the clear terms and effects of the parties' agreements that limited the scope of Davison's duties with respect to any provisional patent application Scorza chose to submit. *See, e.g.*, *Gamesa Energy*, 217 A.3d at 1238; *Ress*, 548 A.2d at 1265.

Scorza did not prove that there was a duty imposed by the contracts for Davison to advise him about patent matters or to refer him to patent counsel. The contracts say quite the opposite. Scorza is attempting to create a duty out of thin air and force it upon Davison in contradiction to the express, written, and agreed-upon terms. Thus, Scorza cannot establish that Davison "breach[ed] a duty imposed the contract[s]," nor can he establish any "resultant damages. As a result, his breach of contract claim fails. *See, e.g.*, *Discover Bank*, 259 A.3d at 495.

---

[28] Ex. R-7 at Davison_24, § 4.J.iii (Acknowledgments); *see also* Ex. R-5 at Davison_159 (cover letter to provisional patent application).

**D.      Scorza Failed to Prove Fraud and Negligent Misrepresentation**

Scorza's fraud and negligent misrepresentation claims also fail. *See* Demand for Arb.
Part IV.B-E. Scorza did not prove that Davison made a false representation, that he
justifiably relied on any of the alleged representations he contrived at the hearing, or that
he suffered any resultant damages. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (stating
elements of fraudulent and negligent misrepresentation claims); *Kirwin v. Sussman Auto.*,
149 A.3d 333, 336 (Pa. Super. 2016) ("[A]t common law, both fraud and negligent
misrepresentation require proof of justifiable reliance.") (citing *Bortz*, 729 A.2d at 560-61).

Scorza's "burden of proof to prove [his] fraud claim[s] is [by] clear and convincing
evidence. Clear and convincing evidence is the highest burden in our civil law and requires
the fact-finder to be able to come to a clear conviction, without hesitancy, of the truth of the
precise fact in issue." *Weissberger v. Myers*, 90 A.3d 730, 735 (Pa. Super. 2014) (citations
omitted). "Fraud must be proved by clear, precise, and indubitable evidence. This means
that the witnesses must be credible, distinctly remember the facts to which they testify, and
narrate the details exactly." *Edelstein v. Carole House Apartments, Inc.*, 286 A.2d 658, 661
(Pa. Super. 1971); *Mancini v. Morrow*, 458 A.2d 580, 584 (Pa. Super. 1983).

Scorza does not come close to meeting this high burden. From the very outset,
Davison made truthful representations to Scorza about its services. Frank Vescio and
Ahmed Arafat testified that in order to comply with the AIPA[29] and the 2008 Consent
Order,[30] Davison designed its online idea submission process so that it was impossible for
Scorza to submit his idea to Davison through that process, as he did, without

---

[29] 35 U.S.C. § 297(a).

[30] Ex. C-20.

acknowledging having received and read the Affirmative Disclosure Statement[31] and the AIPA disclosure statement.[32]

The Affirmative Disclosure Statement included the information required by Section II of the 2008 Consent Order,[33] including: "The total number of consumers in the last five years who made more money in royalties than they paid, in total, under any and all agreements with Davison, is six (6). The percentage of Davison's income that came from royalties paid on licenses of consumers' products in .001%."[34]

The AIPA disclosure statement included the information required by 35 U.S.C. § 297(a), including: "The number of customers who received a net financial profit as a direct result of the company's services over the company's history, since 1989, is thirty five (35). Since 1989, the total number of customers known by Davison to have received license agreements for their product ideas as a direct result of Davison's services is eight hundred twenty one (821)."[35] It also stated that "[i]t is Davison's normal practice to seek more than one contract in connection with a submitted idea[,]" and it included a description of those contracts and their costs.[36]

The parties' contracts and several other documents Davison provided to Scorza were replete with similar statements that Davison was not evaluating the commercial potential

---

[31] Ex. R-35; Ex. R-2 at Davison_69.

[32] Ex. R-36; Ex. R-2 at Davison_69.

[33] Ex. C-20 at 3-6, § II (Affirmative Disclosure Statement).

[34] Ex. R-35.

[35] Ex. R-36.

[36] Ex. R-36.

of Scorza's idea, and that it was "not ma[king] any representations concerning the potential of [Scorza]'s Product to be marketed, licensed, patented or to make a profit for [Scorza]."[37]

Scorza's disputed testimony that he was told Davison had given his idea a "green flag" proves nothing. As Mr. Vescio testified, the purported "green flag/red flag" verbiage simply does not exist at Davison. Mr. Vescio's testimony is consistent with the just-reviewed numerous statements in the contracts Scorza signed and Davison's repeated communications to Scorza that Davison was not evaluating the commercial potential of his idea. Scorza testified that he was told a "green flag" meant that an idea had a better chance of being developed. But again, consistent with Mr. Vescio's testimony, Davison continued to tell Scorza that simply because an idea was being developed, Davison was not making any representations regarding the idea's potential to be marketed, licensed, patented, or to make a profit for him.[38]

In light of these numerous truthful statements from Davison and in the parties' agreements, Scorza simply could not have justifiably relied on any alleged and disputed statements that his idea had been given a "green flag" such that his idea had a good or better chance of being successful. "[T]he case law clearly holds that a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of

---

[37] Ex. R-3 (Pre-Development & Representation Agreement) at Davison_334, § I.D. (Disclaimers); *see also* Ex. R-4 at Davison_193 (Dec. 20, 2016 Idea Security Agreement); Ex. C-29 at Scorza_30-31 (Jan. 9 and 23, 2017 emails: "A typical client invention is not licensed, sold in stores or profitable. Davison offers fee-based services."); Ex. R-4 (Idea to Product Portfolio) at Davison_195, § 1.b; *id.* at Davison_205, § 6; Ex. R-7 (New Product Sample Agreement); at Davison_24, § 4.J.i-iii; Ex. R-16 (Multiple Company Campaign Agreement) at Davison_325, § C.4.a; Ex. R-17 (Inventomercial Presentation Agreement) at Davison_13, § C.iv.

[38] See the documents cited in footnote 37 above.

those representations." *Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 546 (Pa. Super. 2005) (quoting *Blumenstock v. Gibson*, 811 A.2d 1029, 1036 (Pa. Super. 2002)).

Indeed, Scorza himself acknowledged in April 2020 that "I am not blaming Davison for my pessimism because it was still a matter of 'buyer beware!' My main disappointment is that after all these years we have <u>not had a single hit</u> on this pretty unique idea."[39] So Scorza acknowledged and understood Davison's numerous statements that there was no guarantee his idea would be marketed or make a profit, and he proceeded anyway. There was nothing fraudulent about Davison's statements to Scorza throughout their relationship.

Scorza's tactic of relying on select allegations, findings, and conclusions from Judge Lancaster's Findings of Fact and Conclusions of Law in the *FTC v. Davison Associates, Inc.* case[40] also proves nothing. Aside from those findings and conclusions being stale and irrelevant, Scorza's counsel merely read certain findings and conclusions of Judge Lancaster's March, and then asked Scorza whether those findings and conclusions sounded "familiar" to Scorza based on his interactions with Davison. In response to many of these questions, Scorza stated that the statements read were not exactly what Davison allegedly told him. Legally, such imprecise testimony is insufficient to establish a fraud claim. *Edelstein*, 286 A.2d at 661. And factually, as discussed at length above, the parties' agreements and the other communications from Davison to Scorza completely undermine Scorza's attempt to rely on Ex. C-17.

In sum, Scorza's fraud and negligent misrepresentation claims fail for multiple reasons: Davison made truthful representations to Scorza about its services; Davison did

---

[39] Ex. C-33 at Scorza33 (Apr. 8, 2020 email) (emphasis in original).

[40] Ex. C-17.

not conceal material facts from Scorza; Scorza cannot establish justifiable reliance on any alleged (mis)representations in light of the contrary documentary evidence of record; and Scorza cannot establish any resultant damages (as argued in Part II.B above).

**E.      Scorza Is Not Entitled to Punitive Damages**

Scorza's request for punitive damages fails for several reasons. *See* Demand for Arb. Part VI.

**First**, because all of Scorza's pled claims fail, he cannot recover punitive damages. *See Reading Radio, Inc. v. Fink*, 833 A.2d 199, 213-14 (Pa. Super. 2003) ("If no cause of action exists, then no independent action exists for a claim of punitive damages since punitive damages is only an element of damages.") (citation omitted).

**Second**, assuming *arguendo* the breach of contract claim survives the legal and factual impediments outlined above and in Davison's Pre-Hearing Brief, "[u]nder Pennsylvania law, punitive damages are not recoverable in a breach of contract claim." *Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F. Supp. 3d 235, 249 (E.D. Pa. 2022) (citing, *inter alia*, *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 932 (Pa. Super. 1984)). So even if Scorza somehow prevails on his breach of contract claim, he cannot recover punitive damages.

**Third**, as argued at length in Part V of Davison's Pre-Hearing Brief, any claim Scorza makes for punitive damages (or any other damage amount exceeding the $20,042.25 he paid to Davison) is barred by the contracts' valid and enforceable limitation of liability provisions that expressly disclaim punitive damages.[41]

---

[41] Ex. R-7 (New Product Sample Agreement) § 4.N; Ex. R-16 (Multiple Company Campaign Agreement) § A.4.b; Ex. R-17 (Inventomercial Presentation Agreement) § C.ii.

**Fourth**, this case does not rise to the level of "only the most exceptional matter[]" where the "extreme remedy" of punitive damages is warranted. *Phillips v. Cricket Lighters*, 883 A.2d 439, 445-46 (Pa. 2005). "Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Id.* (citations omitted). "[W]hen assessing the propriety of the imposition of punitive damages, the state of mind of the actor is vital. The act, or failure to act, must be intentional, reckless or malicious." *Hutchinson ex rel. Hutchinson v. Luddy*, 870 A.2d 766, 770-71 (Pa. 2005) (citations omitted). "Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed[,] and that he (2) acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.* at 772.

Moreover, "when fraud is the basis of compensatory damages, the same fraudulent conduct is not sufficient to base an award of punitive damages without more. To justify the award of punitive damages, there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others." *Pittsburgh Live, Inc. v. Servov*, 615 A.2d 438, 442 (Pa. Super. 1992); *see SodexoMAGIC*, 24 F.4th at 206.

As noted at length above, there is no evidence that Davison intentionally or negligently defrauded Scorza, let alone any additional acts of malice, vindictiveness, and a wholly wanton disregard of his rights needed to award punitive damages. *See id.* Scorza's patent rights are not lost, *see supra* Part II.A, and Davison truthfully represented the scope and limitations of its services, *see supra* Parts II.D. Finally, the evidence is uncontradicted

that Davison performed all the contracted-for services to Scorza's express, written

satisfaction.[42] There is simply no basis for an award of punitive damages here.

### III.    CONCLUSION

Accordingly, an award should be entered in Davison's favor as to all of Scorza's

claims, and his requests for attorneys' fees, costs, and punitive damages should be denied.

A proposed award is attached hereto as Exhibit 2.

Respectfully submitted,

BARRON LAW OFFICE LLC

Date:  March 3, 2023          By:  _____

Justin T. Barron (PA I.D. No. 200394)
P.O. Box 493
Valencia, PA 16059
(412) 334-6312
jbarron@justinbarronlaw.com

---

[42] Ex. R-10 (Scorza's signed Integrated Product Rendering Presentation questionnaire); Ex.
R-11 (Scorza's signed product design); Ex. R-12 (Scorza's signed Executive Briefing
questionnaire); Ex. R-13 (Scorza's signed Shipping Procedure Agreement)

IN THE AMERICAN ARBITRATION ASSOCIATION

MARIO SCORZA,                          )
                                       )
                    Claimant,          )
                                       )
          v.                           )   No. 01-21-0004-6369
                                       )
DAVISON DESIGN AND                     )
DEVELOPMENT, INC.,                     )
                                       )
                    Respondent.        )

# Exhibit 1

IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| MARIO SCORZA, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) No. 01-21-0004-6369 |
| | ) |
| DAVISON DESIGN AND | ) |
| DEVELOPMENT, INC., | ) |
| | ) |
| Respondent. | ) |

**<u>RESPONDENT'S PRE-HEARING BRIEF</u>**

Respondent Davison Design & Development, Inc. ("Davison"), by its attorneys, submits its Pre-Hearing Brief.[1]

**INTRODUCTION**

Between January 2017 and December 2018, Claimant Mario Scorza's ("Scorza") entered into four separate contracts with Davison to provide services in connection with Scorza's invention idea. Each time, Davison was clear and explicit that by providing these services, Davison was in no way representing that Scorza's idea was a good or marketable one, or that it would result in a third-party license or profits. Despite Davison so advising him and otherwise performing its contractual (and other) obligations, Scorza's idea did not pique the interest of a licensee. Scorza himself acknowledged these risks and Davison's representations, stating as late as April 2020 that he was not blaming Davison because he proceeded as a "matter of 'buyer beware!'"

Scorza has now completely changed his tune, seeking to hold Davison liable for the failure of his idea to result in the profits he apparently convinced himself would be

---

[1] Because a full factual record has not been, and will not be, developed until the upcoming evidentiary hearing, this Pre-Hearing Brief will focus on legal defects in Mr. Scorza's claims and legal defenses. Davison's Post-Hearing Brief will address the evidence introduced at the hearing.

forthcoming, despite what Davison told him. Scorza's Demand for Arbitration is rife with inaccuracies regarding what Davison purportedly did and did not do for him, *see, e.g.*, Demand for Arb. ¶¶ 7-9, and what Davison did and did not tell him both before and during the course of performance, *see, e.g.*, *id.* ¶¶ 9-10.

Davison performed its contractual obligations, and it did not misrepresent facts to or omit facts from Scorza. Scorza's claims also suffer from numerous legal defects. Accordingly, an award should be entered in Davison's favor on all of Scorza's claims.

I.    **Scorza's Breach of Contract Claim Fails Because Davison Performed Its Contractual Obligations**

Scorza first asserts a claim for breach of contract. Demand for Arb. at 5. In addition to wrongly stating that there is only one contract between the parties (there are four), *see id.* ¶¶ 6, 12, Scorza wrongly claims that Davison breached the contracts.

The four contracts at issue are:

1.    a Pre-Development and Representation Agreement dated January 12, 2017 (the "PD Agreement");

2.    a New Product Sample Agreement dated March 29, 2017 (the "NPSA");

3.    a Multiple Company Campaign Agreement dated December 14, 2018 (the "MCCA"); and

4.    an Inventomercial Presentation Agreement dated December 19, 2018 (the "IPA").

Davison performed its obligations under each of these contracts. Under the PD Agreement, Davison: (1) identified a Licensee/target company and submitted Scorza's idea to that Licensee;[2] (2) provided Scorza with the "Idea to Product Portfolio" containing the

---

[2] The initial Licensee/target company was EB Brands Holding Inc., but it was later changed, at Scorza's request, to Conair Corp. Davison submitted Scorza's idea to Conair in

results of Davison's pre-development services; and (3) provided Scorza with the provisional patent application paperwork.

Under the NPSA, Davison: (1) provided Scorza with an "Integrated Product Rendering" setting forth the presentation materials for Scorza's idea; (2) provided Scorza with an "Executive Summary" including, among other things, computerized drawings of the components Davison had manufactured; and (3) created a product sample. Notably, Scorza approved Davison's work, without which Davison would not have proceeded.

Under the MCCA, Davison (1) prepared three lists of target companies to which a presentation of Scorza's idea would be submitted for licensing consideration; (2) obtained Scorza's input and approval of those lists, as well as "teaser" language to submit to the targets who had not previously agreed to keep product ideas from Davison customers confidential; and (3) submitted presentations of his idea to those target companies who had already agreed to keep it confidential, and "teasers" to those target companies who had not to see if they were interested in executing a confidentiality agreement to review the product idea.

Under the IPA, Davison prepared and provided to Scorza a demo video clearly communicating the functions and characteristics of Scorza's product. That video was submitted to the target companies/potential licensees as part of Davison's presentation of Scorza's idea for licensing consideration.

None of the companies Davison contacted as potential licensees expressed an interest in pursuing Scorza's idea. But that is not a breach because Davison had no obligation, contractual or otherwise, to guarantee or obtain such a result. Each of the

---

June of 2018, which was within 6 months after Scorza and Davison agreed on the final design of the product.

parties' agreements included clear and unambiguous disclaimers telling Scorza, in no uncertain terms, that "Davison has made no claim or warranty that Davison will be able to consummate a License Agreement, or find a Licensee willing to compensate [Scorza] for his or her Product and/or Design," and that "Davison has not made any representations concerning the potential of [Scorza]'s Product to be marketed, licensed, patented or to make a profit for [him]."

Mr. Scorza knew of these risks in pursuing his invention idea, and that Davison was not guaranteeing Scorza's success, saying in an April 2020 email: "I am not blaming Davison for my pessimism because it was still a matter of 'buyer beware!' My main disappointment is that after all these years we have not had a single hit on this pretty unique idea." Davison performed its contractual (and all other) obligations, and it is not liable for his disappointment or the failure of his product to be licensed or to make a profit.

## II.   Scorza's Fraud Claims Suffer from Several Fatal Defects

Scorza asserts claims of "common-law fraud," "fraud by non-disclosure," and "negligent misrepresentation." Demand for Arb. ¶¶ 14-16, 21-22, 23-25. There are several fatal legal defects to those claims.[3]

### A.   The Parol Evidence Rule Bars Scorza's Fraud Claims

As the Third Circuit has recently explained, "[w]hen an integrated contract includes a fraud-insulating term—to form what may be called an 'integration-plus' contract— . . . the parol evidence rule prevents the use of extrinsic evidence to vary the fraud-insulating term. And without such evidence, it is virtually impossible to establish the justifiable-reliance element needed for a fraud claim." *SodexoMAGIC LLC v. Drexel Univ.*, 24 F.4th 183, 214

---

[3] In addition, and putting aside these legal defects, Scorza cannot establish each element of his fraud claim by the requisite clear and convincing evidence. *See Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991).

(3d Cir. 2022). "Left undisturbed by extrinsic evidence, a no-reliance clause, through which a party disclaims reliance on any prior representations, makes it ***legally impossible*** for a party to establish that it justifiably relied on a precontractual representation. Thus, through the operation of the parol evidence rule, a no-reliance clause in an integrated contract precludes fraudulent inducement claims that depend on a precontractual misrepresentation." *Id.* (emphasis added) (citations omitted).

The parties' Agreements are integrated and contain a no-reliance clause.[4] It is thus "legally impossible" for Scorza to establish that he justifiably relied on any pre-contractual representations, thus "preclud[ing]" Scorza's attempt to base his fraud claims on a pre-contractual representation. *See id.*; *see also Youndt v. First Nat'l Bank of Port Allegany*, 868 A.2d 539, 546 (Pa. Super. 2005) (same).

### B.    The Gist of the Action Doctrine Bars Scorza's Fraud Claims

To the extent Scorza claims that Davison committed fraud by failing to give him the benefit of the bargain set forth in, or made misrepresentations regarding its duties under, the parties' Agreements, *see* Demand for Arb. ¶¶ 14-16, 21-22, 23-25, that is barred by the gist of the action doctrine.

"Under Pennsylvania law, the gist of the action doctrine prevents a purely contractual duty from serving as the basis for a tort claim." *SodexoMAGIC*, 24 F.4th at 216 (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 65 (Pa. 2014)). "Where a duty is created by

---

[4] The Agreements include the following or substantially similar language:

> The parties intend this document to be the complete, exclusive, final and fully integrated statement of their agreement. Neither party is relying upon any oral agreement or representation in entering into this Agreement and all prior oral agreements or representations are hereby considered null and void.

contract, the gist of the action doctrine requires that a claim for a breach of that duty be brought in contract, not tort." *Id.* (citing *Bruno*, 106 A.3d at 68).

Where "the [alleged] fraudulent misrepresentations are based in the performance of the [parties'] contract[, such as where the p]laintiff alleges that [d]efendant did not give him the benefit of his bargain," and bases the fraud claim on alleged "fraudulent misrepresentation allegations that allegedly ensued in the middle of the performance of the" contract, that claim is precluded by the gist of the action doctrine because it is "clearly intertwined [with] and fully based upon the failure of performance under the alleged contract and do[es] not relate to some broader social duty." *Clark v. Applied Cardiac Sys., Inc.*, No. 21-cv-1123, 2022 WL 798370, at *9-10 (W.D. Pa. Mar. 16, 2022) (Schwab, J.).

Scorza cannot transform contract-based duties and alleged breaches of the parties' Agreements into fraud claims under the gist of the action doctrine, so his fraud claims fail on this basis as well. *See id.*; *SodexoMAGIC*, 24 F.4th at 216.

### III.   Scorza's UTPCPL Claim Fails Because His Purchase of Goods or Services from Davison Was Not "Primarily for Personal, Family, or Household Purposes"

Scorza's asserted claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") fails because his purchase of services from Davison was for investment, business, and commercial purposes—not "primarily for personal, family, or household purposes," as the statute requires. 73 P.S. § 201-9.2(a).

The UTPCPL provision creating a private cause of action states, in relevant part, that "[a]ny person who purchases or leases goods or services ***primarily for personal, family or household purposes*** and thereby suffers any ascertainable loss of money or property[] . . . may bring a private action . . . ." *Id.* (emphasis added).

"In construing claims under the [UTP]CPL, Pennsylvania courts have distinguished purchases made for business reasons, which are ***not*** actionable, from those made for 'personal, family or household use[,]'" which are actionable. *Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238, 242 (3d Cir. 2002) (citations omitted). Whether a purchase is primarily for personal, family or household purposes depends on the "***purpose*** of the purchase, not the ***type of product*** purchased." *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 644 (Pa. Super. 1990) (emphasis in original).

So if a person purchased goods or services "for commercial purposes only," or "primarily as an investment" in which the plaintiff "intend[ed] to make money from" third-party sales, those claims fail as a matter of law under the UTPCPL because they are not "primarily for personal, family or household purposes." *See, e.g.*, *Growall v. Maietta*, 931 A.2d 667, 675-76 (Pa. Super. 2007) (affirming dismissal where plaintiff "purchased the [real] property primarily as an investment rather than to live in, intending to make money from the property by leasing the apartments to tenants"); *Lal v. Ameriprise Mortg. Co.*, 858 A.2d 119, 124-25 (Pa. Super. 2004) (affirming dismissal where plaintiff "did not purchase the property for personal, family or household purposes[, instead t]hey purchased it as an investment property"); *Trackers Raceway, Inc. v. Comstock Agency, Inc.*, 583 A.2d 1193, 1197 (Pa. Super. 1990) (en banc) (affirming dismissal because the insurance policy purchased "was purchased for commercial purposes only[]" and plaintiff sought "damages arising from the interruption of its business operations").

Scorza clearly purchased services from Davison for business, commercial, and investment purposes—not primarily for personal, family, or household purposes. Each of

the parties' four agreements expressly stated as much.[5] The purpose of Scorza's purchase of Davison's services was so that he could develop his idea into a product he could sell to third parties on the market. Moreover, he did not intend to use the product primarily for his own personal use. Indeed, Scorza has sought expert testimony to pursue his claim of "lost profits" damages arising from his alleged inability to market and sell the product and to make money from third-party sales. *See* Demand for Arb. ¶¶ 8-9, 12. That his idea was a scale that could be used for personal, family, or household purposes is irrelevant—the purchase of services from Davison was for Scorza's business, investment, and commercial purposes, and the type of product at issue is irrelevant. *See Valley Forge*, 574 A.2d at 644.

Scorza's UTPCPL claim therefore fails as a matter of law. *See* 73 P.S. § 201-9.2(a); *Growall*, 931 A.2d at 675-76; *Lal*, 858 A.2d at 124-25; *Trackers Raceway*, 585 A.2d at 1197.

## IV.   Scorza's Claim for Attorneys' Fees Fails as a Matter of Law

The failure of Scorza's UPTCPL claim means that his claim for attorneys' fees also fails. *See* Demand for Arb. ¶ 26. There is no other applicable fee-shifting statute; there is no contractual fee-shifting provision in the parties' contracts; and there is no fee-shifting in fraud cases.[6] *See McMullen v. Kutz*, 985 A.2d 769, 776 (Pa. 2009) (noting Pennsylvania's prevailing American rule regarding attorneys' fees where, as here, there is no contractual fee-shifting provision); *Koffman v. Smith*, 682 A.2d 1282, 1285 (Pa. Super. 1996) (no fee-

---

[5] Each of the agreements included a provision containing the following, or substantially similar, language: "[Scorza] acknowledges that he/she is contracting for Davison's services for the business purpose of developing [Scorza]'s idea commercially and not for any personal, household or family purpose."

[6] Davison is not conceding Scorza's fraud claim has merit. As noted above, it does not. However, even assuming *arguendo* his fraud claim did not fail as a matter of law, he still could not recover attorneys' fees as to that claim.

shifting in fraud cases). Because Scorza's UTPCPL claim fails, there is no viable basis for him to recover his attorneys' fees.

**V.      Scorza Cannot Recover Lost Profits or Punitive/Exemplary Damages**

Scorza's claim for lost profits and punitive damages fails given the contracts' limitation of liability provisions that disclaim precisely such damages. *See* Demand for Arb. ¶ 27; Scorza's Expert Disclosures (identifying purported lost profit damages report).

The parties' agreements contain clear limitation of damages language (emphasis added):

> The liability of the parties for any and all claims arising from or relating to this Agreement or its formation is limited to direct, actual damages only and is further limited to not exceed the amount actually paid by Client for the services. ***In no event will Davison be liable to Client for any consequential, exemplary, incidental or punitive damages, including lost opportunities or lost profits***.

This is a limitation of liability clause, which places a limit on Davison's liability, not an exculpatory clause, which would insulate Davison from ***all*** liability. "The difference between the two clauses 'is a real one.'" *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 202 (3d Cir. 1995) (cleaned up) (quoting *Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751, 755 (3d Cir. 1976)); *see also, e.g., id.* at 202-03; *Marsulex Envtl. Techs. v. Selip S.P.A.*, 247 F. Supp. 3d 504, 510-13 (M.D. Pa. 2017); *Great N. Ins. Co. v. ADT Servs., Inc.*, 517 F. Supp. 2d 723, 749 (W.D. Pa. 2007). Because of this difference, "those cases which involve the enforcement of exculpatory clauses are simply inapposite here[, where a limitation of liability clause is at issue]." *Great N. Ins.*, 517 F. Supp. 2d at 749 (citation omitted). So Scorza is wrong to the extent he relies on case law construing and applying tests applicable to exculpatory clauses.

"Pennsylvania common law . . . makes clear that said limitation [of liability clauses] [are] valid and enforceable." *Id.* (citing cases); *see also, e.g., Valhal*, 44 F.3d at 203-04. These

provisions are enforceable regardless of whether the party against which the provision is to be enforced is allegedly "unsophisticated," or there is an alleged disparity in bargaining power between the parties. Both *Valhal* and *Great Norther Insurance* cite Pennsylvania case law enforcing such limitation of liability clauses against consumer plaintiffs. *See Valhal*, 44 F.3d at 203 (citing *LoBianco v. Prop. Protection, Inc.*, 437 A.2d 417 (Pa. Super. 1985), *Magar v. Lifetime*, 144 A.2d 747 (Pa. Super. 1958), *Shafer v. Reo Motors*, 205 F.2d 685 (3d Cir. 1953), and *Bash v. Bell Tel. Co. of Pa.*, 601 A.2d 825 (Pa. Super. 1992)); *Great N. Ins.*, 517 F. Supp. 2d at 749 (same); *Greenspan v. ADT Sec. Servs. inc.*, 444 Fed. Appx. 566 (3d Cir. 2011) (affirming summary judgment against consumer plaintiff). Scorza cannot avoid the effect of the limitation of liability clauses by claiming he is an "unsophisticated consumer." *See id.*

Nor can Scorza avoid those effects by arguing that the agreements are "contracts of adhesion." "[M]erely because a contract is one of adhesion does not render it unconscionable or unenforceable as a matter of law." *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007); *Bayne v. Smith*, 925 A.2d 265, 270 (Pa. Super. 2009). Labeling the Agreements as "adhesion contracts" does nothing to avoid the effectiveness or enforceability of the Agreements' limitation of liability provisions.[7]

The Agreements were not unconscionable, either, as Scorza was "a free agent who c[ould have] simply walk[ed] away without signing the [Agreements] and participating in the activity [set forth therein], . . . thus the [Agreements] signed under such circumstances

---

[7] Davison is not conceding that any or all of the Agreements at issue are, in fact, adhesion contracts. Scorza was able to negotiate certain provisions of the Agreements, most notably the price terms. So the Agreements were not adhesion contracts. *See, e.g., Chepkevich v. Hidden Valley Resort, LP*, 2 A.3d 1174, 1190 (Pa. 2010) (defining "adhesion contract[s]"). But even if they were found to be adhesion contracts, that does not render them or their limitation of liability provisions unenforceable, as noted in the text above.

[were] not unconscionable."[8] *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1191 (Pa. 2010).

"In commercial settings, a limitation of damages clause will rarely be found [to be] unconscionable." *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 264 (Pa. Super. 1997). As noted above, Scorza repeatedly acknowledged the commercial setting in which the Agreements arose, as evidenced by the commercial purpose and intent to market his product to third parties. *See supra* Part III.

Likewise, "it is settled law that mere unequal bargaining power between the parties to a contract does not render the contract, or a provision thereof, unconscionable." *Borden*, 701 A.2d at 264; *Quilloin v. Tenet Health Sys. Phila., Inc.*, 673 F.3d 221, 235 (3d Cir. 2012). Again, Scorza cannot avoid the limitation of liability clauses here simply by claiming he was an "unsophisticated consumer," as that is contrary to the commercial nature of the parties' Agreements, and insufficient as a matter of law in any event.

Notably, courts regularly determine the enforceability of and enforce limitation of liability provisions at the pleadings or summary judgment stage—*i.e.*, without the need for a full-blown evidentiary hearing. *See, e.g.*, *Marsulex*, 247 F. Supp. 3d at 510-13 (motion to dismiss); *Valhal*, 44 F.3d at 202-03 (summary judgment); *Great N. Ins.*, 517 F. Supp. 2d at 746-50 (same); *Greenspan*, 444 Fed. Appx. at 568-70 (same); *Borden*, 701 A.2d at 262-64 (same).

There are no factual issues relating to the enforcement of the limitation of liability provisions in the parties' Agreements against Scorza such that Scorza should be permitted to introduce evidence of his alleged lost/punitive damages at the hearing, including but not

---

[8] Scorza has the burden of proving unconscionability, which "is as a question of law for a court." *Todd Heller, Inc. v. United Parcel Serv., Inc.*, 754 A.2d 689, 700 (Pa. Super. 2000); *Centric Bank v. Sciore*, 263 A.3d 31, 39 (Pa. Super. 2021).

limited to his purported expert report on lost profits. Consistent with longstanding Pennsylvania law, the Agreements' limitation of liability provisions are enforceable against Scorza as a matter of law in this setting, so there is no basis for him to recover any indirect damages expressly prohibited by those provisions, including the lost profits damages he would introduce at the hearing. Given the validity, enforceability, and effect of the limitation of liability provisions, Scorza cannot recover lost profits/lost opportunities damages, so his lost profits expert testimony is not relevant and would do nothing to promote the efficient resolution of this matter, and it should not be introduced at the hearing.

**CONCLUSION**

For these reasons, and the reasons to be developed at the evidentiary hearing and advocated in Davison's Post-Hearing Briefs, an award should be entered in Davison's favor as to each of Scorza's claims.

Respectfully submitted,

BARRON LAW OFFICE LLC

Date:  May 16, 2022                By:
_____
Justin T. Barron (PA I.D. No. 200394)
P.O. Box 493
Valencia, PA 16059
(412) 334-6312
jbarron@justinbarronlaw.com

12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served

via email this 16th day of May, 2022 upon the following counsel of record:

Bradley A. Nevills, Esquire
bnevills@kmd.law
William Yarbrough, Esquire
wyarbrough@kmd.law
Stacey L. Barnes, Esquire
sbarnes@kmd.law
Kearney, McWilliams & Davis, PLLC
55 Waugh Drive, Suite 150
Houston, TX 77007

_____
Justin T. Barron

IN THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | No. 01-21-0004-6369 |
| | ) | |
| DAVISON DESIGN AND | ) | |
| DEVELOPMENT, INC., | ) | |
| | ) | |
| Respondent. | ) | |

# Exhibit 2

IN THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| MARIO SCORZA, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) No. 01-21-0004-6369 |
| | ) |
| DAVISON DESIGN AND | ) |
| DEVELOPMENT, INC., | ) |
| | ) |
| Respondent. | ) |

**[PROPOSED] AWARD OF ARBITRATOR**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements entered into between the above-named parties and dated January 12, 2017, March 29, 2017, December 14, 2018, and December 19, 2018, and having been duly sworn, and having duly heard the proofs and allegations of the Claimant, represented by Stacey L. Barnes and William Yarbrough, and Respondent, represented by Justin T. Barron and George Crompton, hereby FIND and AWARD as follows:

In favor of Respondent, Davison Design and Development, Inc., and against Claimant, Mario Scorza, as to all of Claimant's claims. I award no damages to Claimant.

The administrative fees of the American Arbitration Association and the compensation of the arbitrator are to be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

I, Scott D. Livingston, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____
Date

_____
Scott D. Livingston

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served

via email this 3rd day of March, 2023 upon the following counsel of record:

Bradley A. Nevills, Esquire
bnevills@kmd.law
William Yarbrough, Esquire
wyarbrough@kmd.law
Stacey L. Barnes, Esquire
sbarnes@kmd.law
Kearney, McWilliams & Davis, PLLC
55 Waugh Drive, Suite 150
Houston, TX 77007

Justin T. Barron