**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVISON DESIGN &** | ) | |
| **DEVELOPMENT, INC. ,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **CA No. 2:23-cv-644** |
| | ) | |
| **MARIO SCORZA ,** | ) | |
| *Defendant.* | ) | **Judge Marilyn J. Horan** |

## Defendant's Exhibit 7

Defendant's Exhibit 7

# BEFORE THE TRIBUNALS OF

# THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MARIO SCORZA, | § | |
| *Claimant,* | § | |
| | § | |
| V. | § | NO. 01-21-0004-6369 |
| | § | |
| DAVISON DESIGN AND | § | |
| DEVELOPMENT, INC. | § | |
| *Respondent* | § | |

## CLAIMANT'S POST-HEARING BRIEF

## Table of Contents

I.   FACTS .................................................................................................................. 2

II.   CONTRACTUAL DUTY ................................................................................... 10

III.   DUTY OF CARE IN TORT .............................................................................. 11

IV.   CAUSES OF ACTION ...................................................................................... 15

   A.   Breach of Contract ..................................................................................... 15

   B.   Common Law Fraud ................................................................................... 15

   C.   Fraud By Concealment and Non-Disclosure/Omission ............................ 16

   D.   Negligent Misrepresentation ...................................................................... 17

   E.   Fraud in the Inducement ............................................................................ 18

   F.   Common Law Negligence .......................................................................... 19

V.   PENNSYLVANIA UTPACPL ........................................................................... 20

   A.   Applicability ............................................................................................... 20

   B.   Violations ................................................................................................... 21

   C.   Strict Liability ............................................................................................ 22

   D.   Damages & Trebled Damages .................................................................... 24

VI.   CONTRACTUAL DISCLAIMERS OF LIABILITY ........................................ 25

VII.   DAMAGES ........................................................................................................ 28

VIII.   CONCLUSION .................................................................................................. 30

Claimant, Mario Scorza, (hereafter "Scorza") contracted with Davison Development and Design, Inc. (hereafter "Davison") for services related to invention development, wherein several sequential agreements were entered into as to facilitate Claimant's introduction into the weight scale market between January 2017 and December 2020. Parties held an Arbitration Hearing on the Merits in January and February of 2023 and submit this post-hearing brief for consideration:

## I.    FACTS

At the conclusion of three (3) days of evidentiary hearings spanning over several weeks, including testimony from Mr. Scorza's patent expert, damages expert, and himself, as well as Davison's representatives, Davison remains recalcitrant and refuses to admit that even one of its willful, wonton, or negligent actions leads to even a modicum of liability producing not even an ounce of obligation to Mr. Scorza. In fact, despite an onslaught of overwhelming evidence, Davison is confident in its deftly "contracted for" impunity and bolsters itself through its documents of adhesion, which Davison believes absolves it of all past indiscretions and future transgressions. Simply, Davison has an unfounded belief that it can contract away from absolutely every possibility wherein Davison is culpable or has any responsibility to its clients – a departure from reality from which Davison has been handsomely rewarded.  Yet, the evidence provided, in addition to the documents Davison conveniently *cannot* provide, i.e., the nondisclosure agreements, undeniably proves that Davison's "products and services" are just smoke and mirrors.

Based on the factual evidence the following is clear:

1. Davison authored, and irrefutably argues that its contracts that are iron clad and absolve Davison of all liabilities.

2. Scorza entered into the following agreements:

   a. "Pre-Development and Representation Agreement" ("Pre-Development Agreement") signed on or around January 12, 2017, for $795. Respondent

Hearing Exhibit (*hereinafter* "R") 3; Claimant Hearing Exhibit (*hereinafter* "Cl.") 48.

    b. "New Product Sample Agreement" ("NPSA") signed on or around March 29, 2017, for $14,757. R. 7; Cl. 11.

    c. "Multi Company Campaign Agreement" ("MCC") signed on or around December 14, 2018, for $3,995. R. 16; Cl. 49.

    d. "Inventomercial Presentation Agreement" ("IPA") signed on or around December 19, 2018, for $1,495. R. 17; Cl. 44.

3. Davison had a contractual duty to Scorza to aid and instruct his inventive endeavors.

4. Davison emphasized the importance of obtaining patent rights by means of a provisional patent application in the Pre-Development Agreement and without a provisional patent application, Davison would not engage with potential target companies. R. 3.

5. Davison attempted to file the provisional applications twice, but *failed* to competently file Scorza's Provisional Patent Applications as follows:

    a. First attempt was an application signed by Scorza on February 22, 2017, whereafter Scorza mailed an application to Davison for filing to the United States Patent and Trademark Office ("USPTO"); however, Davison **failed** to include the necessary parts as evidenced by the Office Action for Notice of Incomplete Provisional Application. Cl. 5 (First Provisional and Notice).

    b. Second attempt was an application signed by Scorza on February 5, 2018, whereafter Scorza mailed the application to Davison for filing to the USPTO; however, Davison **failed** to include proper payment amount as evidenced by the Office Action for Notice to File Missing Parts of Provisional Application, a difference of **only** Five Dollars ($5). Cl. 6 (Second Provisional and Notice).

    c. According to the USPTO Manual of Patent Examining Procedure (MPEP) § 601 (a)(4), "[T]he filing date of an application shall be the date on which a *specification*, with or without claims, is received in the United States Patent and Trademark Office." 35 U.S.C. 111 (b)). Here it is the case that Davison classifies and stores the

first attempt as "PATENT & FILING RECEIPT" and the second attempt as "CLIENT PATENT," but no official filing receipt was ever issued by the USPTO and a filing date was never afforded or granted to Scorza. Cl. 43, p. Davison_000073.

6. Davison's witness Frank Vescio ("Vescio") testified that Davison undertook the duty to file all provisional patent applications by submitting the application to the USPTO, along with a check for the necessary filing fee, on behalf of its clients.

7. Scorza testifies that he submitted all requested paperwork and payments to Davison and was informed by Larry Rifkin ("Rifkin") that his idea was a "Green Flag" and Mr. Rifkin commented that "there was nothing like it" and Scorza's idea was "good to go" unlike lots of other ideas which are deemed "red flags," meaning they do not go "very far." Cl. 30, p. Scorza_00061.

8. Through the testimony of patent expert Scott McBride ("Mr. McBride"), Mr. Scorza's patent rights were irreparably lost due to Davison's negligent mishandling of each patent filing and based on the actions of Davison, Davison was undoubtedly practicing patent law by mailing provisional patent applications to the USPTO with the filing fee; even if the application was incomplete, the actions by Davison to mail in the application constitutes practicing patent law. Furthermore, despite being given *actual* notice on multiple occasions by Scorza of the filing deficiencies, Davison failed to take any measures to correct the deficient and incomplete filings and protect Scorza's patent rights. Cl. 5, 6 & 12; R. 23.

9. Davison further emphasized the importance of confidentiality in the Pre-Development Agreement and other subsequent agreements, in the sense that Scorza should not communicate with any other parties regarding his invention the "Trava-Weigh." Cl. 45. Veciso Arb. Test., Feb. 1, 2023.

10. Davison held the exclusive right to communicate with target companies and divulged confidential invention information regarding the Trave-Weigh to multiple entities. Cl. 41, p. Davison_000042; R. 6; R. 23, p. Davison_000042.

4

11.  Davison marked the product sample renderings with the language "Patent Pending," with actual knowledge of its falsity. R. 8; Cl. 13.

12. Davison is unable to proffer to Scorza a single Non-Disclosure Agreement ("NDA") protecting the confidentiality of Scorza's invention to even one company in which "Video Reality Product Presentations" ("VRPP") were made and "Video Ideation Sketch" ("VIS") sent to. *See* Cl. 41, Davison_000042 & Davison_000048 (companies VRPP was made to: Sonashi, Cuisinart, Globe Food Equipment Company, Sumdex, Exceptional Products, Inc., Riverstone Industries, HAD Trading Corp and Delsey Luggage, Inc; and companies VIS were sent to: Delsey Luggage, Inc., HDS Trading Corp., Riverstone Industries, Exceptional Products, Inc., and Sumdex). Davison attempts to deceive this Tribunal into believing that NDA's were sent out to the above companies. It references unsigned form NDA agreements.  **Absolutely no signed NDA's were ever offered into evidence, or even produced in response to Scorza's discovery requests. They do not exist.**  Like the patent applications, NDA's simply were not relevant to Davison's way of making money.

13. Through the testimony of patent expert Mr. McBride, Mr. Scorza's patent rights were barred by both (1) public disclosure and (2) an offer to sell, under Section 2152 of the MPEP defining 35 USC Section 102 requirements. Further, under USPTO mandated guidelines, *reduction to practice* started the one-year clock for filing a patent application, and failure to observe this resulted in Scorza losing his patent rights.

14. Through the testimony of damages expert, Dr. Kenneth Lehrer ("Dr. Lehrer"), the loss of the rights to the patent resulted in a loss of value to Mr. Scorza of about $3.45 million dollars over 10 years. In order to calculate the damages, Dr. Lehrer set the stage testifying that the best way to value a lost patent is through a model business enterprise producing and selling the invention.  Cl. 38, p. 4, 8-10.

It is clear from the factual evidence and testimony from Davison's own representative, Mr. Vescio that the negligence of Davison to observe its own self-directed and drafted clauses to competently and correctly file Claimant's Provisional Patent Application, on two (2) distinct

occasions; to correct Davison's negligent mishandling of patent filings; as well as disclosing confidential invention information to multiple target companies are the direct and immediate cause of Mario Scorza's economic and irreparable injury.

It is of upmost importance to make note that this is not the first time that Davison has committed this conduct. In fact, this is an established pattern, a well-oiled machine, a scam, that Davison has been maliciously practicing since 1989 and were prosecuted for by the Federal Trade Commission ("FTC") in Western District of Pennsylvania under "Project Mousetrap." The Judge issued a $26 million dollar judgment against Davison along with a finding of fact and conclusions. *See* Cl 17. Vescio during his testimony *wholeheartedly denies* all findings of fact and conclusions of law – stating that the Judge was "dead wrong" – and that none of the following actions, during his twenty plus years, carried out by Davison are true:

1. <u>Reasonably Good Chance of Financial Gain</u> - Based on the overall, common sense, net impression on a reasonable consumer, Davison falsely represent, both directly and by implication, that consumers who buy their services stand a reasonably good chance of realizing financial gain by: (a) representing that they are selective as to whom they offer services based on the quality, value, and/or originality of a consumer's idea; (b) representing that they have a genuine stake in the consumer's invention through royalties, when in fact, fees charged, and not royalties collected, are the main source of defendants' income; and (c) misrepresenting their track record.

2. <u>Misrepresentation of Track Record</u> - The overall, common sense, net impression on a reasonable consumer of Davison's track record overstates the reasonable possibility of financial gain.

3. <u>Many Products are Profitable</u> - Regardless of how Davison inflates its track record, there is no reasonable implication from Davison's overall marketing and sales materials that "many" consumers have made a profit as a result of using their services.

4. <u>Profitability of Certain Products</u> - While it is true that defendants never use the term "profitable" in reference to these particular products, based on the overall, common

sense, net impression, a reasonable consumer would equate such specific statements of successful sales and marketing with profit.

5. <u>Special Access to Corporations</u> - Based on the overall, common sense, net impression on a reasonable consumer Davison falsely represent that they have a vast network of corporations with whom they have ongoing, special relationships, and with whom they regularly negotiate successful licensing agreements. Pre-Complaint, Davison told consumers explicitly that they worked directly with manufacturers, had close personal contacts, and cut through the "red tape" and the "old boys' network" to obtain licenses for their clients. Although this may be technically true of a handful of smaller companies, Davison implied that they had such relationships with hundreds of *large*, nationally known companies, which they did not.

6. <u>Close Working Relationship</u> - Through the corporate montage, Davison implies relationships with companies that have not even registered with Davison as being willing to accept new product ideas from them.

7. <u>Necessity of Services</u> - Based on the overall, common sense, net impression on a reasonable consumer, Davison misrepresent that its invention marketing services are necessary for consumers to license their invention ideas to corporations. Davison explicitly states that its virtual reality/prototype product presentation portfolios will get the consumer's idea "taken seriously" and are a "necessity" when working with large corporations. Although a reasonable consumer expects a salesperson to portray his products in the best light possible and to try to convince the consumer that he is selling something that the consumer must have, Davison claims to have expertise and experience in licensing products to large corporations and uses this perceived position of superior knowledge over the consumer to convince the consumer that when a salesperson says that something is needed in order to proceed, it is.

8. <u>Executive Summary</u> - Based on the overall, common sense, net impression on a reasonable consumer Davison misrepresents that it prepares objective and expert analyses of the marketability of consumers' invention ideas.

Undoubtedly, the FTC ruling has not enjoined Davison's abhorrent activity but rather instructed Davison to artfully choose and finesse its words, hone its skills and more closely observe the demarcated path defined by the FTC to adhere to the strict letter of the FTC ruling, while entirely eviscerating the FTC's intent. Davison, along with the hefty fine of $26 million, was required to provide an Affirmative Disclosure Statement in a clear and conspicuous manner, but this statement does not evade the fact that Davison continues to play on the fine line drawn by the FTC. Cl. 16; Cl. 17. To date, Davison continues to create a situation of peril where Davison ultimately ends up bamboozling customers for money.

On the other hand, Dr. Lehrer provides an analysis of what Mr. Scorza's money would have gotten him if Davison adhered to its contracts, duty of care, filed the patent applications competently, instead of deceiving Mr. Scorza.

1. Dr. Lehrer refers to the enterprise model also as "The Theory of the Firm." Cl. 38, p. 8-10. "The value of the firm is the present value of the firm's expected future net cash flows," and there is no need to account for inflation, because the present value analysis was not discounted. *Id.*, p. 9. Dr. Lehrer Arb. Test., Jan. 19, 2023.

2. Dr. Lehrer unveiled that the personal scales market is a growing market in the United States and is currently valued at $670 million per year. Typical conservative market captures for new products in the consumer goods market would run in the 0.08% to 0.12% of the market. A price per unit in the $20-25 range would be appropriate for the new product, based on similar competitive products. Dr. Lehrer Arb. Test., Jan. 19, 2023.

3. Twenty-five years ago, the most appropriate business enterprise model for a patent or invention would be a firm that sold the product in a retail brick and mortar establishments. However, due to the internet retail revolution, the most typical business enterprise model today for a consumer good is to produce the good in China or a similar low-cost location and to sell them through an online retail platform, such as Amazon. Dr. Lehrer Arb. Test., Jan. 19, 2023.

4.  Dr. Lehrer testified a future or hypothetical business is valued by means of a sensitivity analysis, also known as a Monte Carlo analysis - a sensitivity analysis based on a variation of a set of scenarios or the process of varying model input parameters over a reasonable range (range of uncertainty in values of the model's parameters) and observing the relative change in the model's response. Dr. Lehrer further testified that this method is often used for merger or acquisition fairness opinions when target companies feature a new product.  It is also used and found reliable in SEC filings, particularly those featuring forward looking statements; and Dr. Lehrer testified that he has previously performed Monte Carlo analyses that have been in used in merger and acquisition fairness opinions and SEC filings.

5.  Dr. Lehrer consulted with Amazon Co. and a customs broker and import-export attorney to appropriately model costs and expenses for his business enterprise model. He accounted for: cost of goods sold, manufacturing fees, an Amazon 10 year Retailer Plan; Amazon's commission per unit sold; container costs for import; harbor maintenance fees; tariffs; warehouse transport costs; Customs goods examination costs; customs brokerage fees; yearly import bond; demurrage; inspection fees; insurance; and miscellaneous costs.  Applying these expenses, Dr. Lehrer found the cost of goods sold in the 15% range, and the costs and expenses in the 30-33% of revenues, resulting in profits in the 47-50% of revenue range. Dr. Lehrer Arb. Test., Jan. 19, 2023.

6.  Dr. Lehrer's testimony proposed market capture numbers leads to a patent valuation of around $3.45 million dollars over 10 years based on an average of the provided scenarios:

    a.  A low range capture of 0.08% of the $670 million per year market would lead to revenues of $536,000/year or around $2.5 million of lost profits in 10 years.

    b.  A mid-range capture of 0.10% of the $670 million per year market would lead to revenues of $670,000/year or around $3.7 million of lost profits in 10 years.

    c.  A high-range capture of 0.12% of the $670 million per year market would lead to revenues of $840,000/year or around $4.1 million of lost profits in 10 years.

9

## II.    CONTRACTUAL DUTY

Under Pennsylvania law, a party to a contract has two duties: (1) a contractual duty and (2) a legal duty to act without negligence toward both the other party to the contract and third parties. *Weiser v. Bethlehem Steel Corp.*, 508 A.2d 1241, 1245 (Pa. Super. 1986).

First and foremost, in the Pre-Development Agreement, Davison established its own contractual obligation to file a Provisional Patent Application on behalf of Mr. Scorza. (Cl. 48, Davison_000332). Having taken this obligation upon itself, Davison has the additional responsibility to competently observe and accomplish the dictates of the "essential terms", in essence to conform to meet that duty, by substantially performing the agreed-upon task. This substantial performance is defined where: [I]n Pennsylvania, the equitable doctrine of substantial performance protects "those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects." *Mort Co. v. Paul*, 76 A.2d 445, 447 (Pa. Super. Ct. 1950). Here, it is undoubtedly the case that no filing was ever granted, no rights were preserved, and no rights are retrievable, thus Mr. Scorza is forever damaged.

According to Davison's NPSA, Davison was contractually obligated to provide, both, a final product (with packaging) and to accept "all reasonable requests" which "are consistent with the goal of solving the problem in a simple and cost-effective manner." Cl. 22, SCORZA0002-0004. Neither was accomplished. Mr. Scorza, was never provided with any sort of product sample. Mr. Scorza only received computerized renderings, contrary to Davison's contractual obligation to develop and provide a physical product sample. Scorza Arb. Test., Feb. 18, 2023.

Further, and most telling, Davison failed to produce even an iota of assistance, even after multiple documented implorations and pleas, to attempt any remediation of Mr. Scorza's increasingly dire position. Cl. 12; R. 23.  Davison's breach of its contracts, combined with a failure to remedy, has undoubtedly caused direct harm to Mr. Scorza, including, but is not limited to, the complete annihilation of any possibility Mr. Scorza had of receiving patent rights due to Davison's deficient patent applications and wonton disregard for Mr. Scorzas perilous

position. Davison's inability to achieve the most rudimentary status of "Patent Pending" on either of Mr. Scorza's Provisional Patent Applications, as detailed in our Patent Expert Report, is just two examples of Respondent's ineptitude and callous disregard reflected in Davison's numerous exponentially consequential contractual breaches. Cl. 5 & 6.

### III.   DUTY OF CARE IN TORT

The primary element in a negligence cause of action is that the defendant owes a duty of care to the plaintiff. *See Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 280 (2005). The concept of duty in a tort setting can be intertwined with contractual notions of privity, as is the case here, where the task is to determine whether the relationship between the parties gives rise to a duty. *Id*. at 281.

The Supreme Court of Pennsylvania has held that the "determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (2000). This traditional approach to duty in tort can be used to show that Davison owed a duty to Mr. Scorza, which Davison subsequently breached, and failed to cure, despite Mr. Scorza's pleas for remediation and therefore caused immense damage over the course of several years – damage which continues to be wrought to this day.

First, as previously stated, Scorza contracted with Davison for services related to invention development, wherein several sequential agreements were entered into as to facilitate Mr. Scorza's introduction into the weight scale market between January 2017 and December 2020. These agreements and correlated communications that were based on Davison's negligently misleading and mischaracterized assertions unbeknownst to Mr. Scorza, clearly indicate a relationship existed between the two parties. Further, Mr. Scorza invested in and relied upon Davison's intentional misrepresentations of material facts germane to the parties' relationship, resulting in damages.

Second, on the question of the social utility of the conduct at issue, obviously patent research and development services play an important role in promoting the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive *right* to their respective writings and discoveries. U.S. Const. art. I, § 8, cl. 8. Purposively, this is the only use of the word "right" used by our Founding Fathers throughout the U.S. Constitution wherein the importance of such a right form the undergirding of our country's entire basis.  But, by the same token, given the important reliance placed upon such services, there is no reason to exempt such parties who take on a positive, contractual duty upon themselves to *attempt* to practice law and engage in successful patent filing services, successfully or otherwise, from the tort consequences of a negligent failure to perform those services in a competent fashion.

Third, Davison was aware that it put Mr. Scorza at risk of potential harm. Davison repeatedly informed Mr. Scorza of the importance of obtaining such patent rights and the need to keep his invention confidential. Cl. 45; Cl. 41, p. Davison_000042; R. 6; R. 23, p. Davison_000042. The risk to Mr. Scorza's patent rights was known to Davison and the loss and consequences of that loss were entirely foreseeable by Davison, where Davison was the harbinger of the ill and the custodian of Mr. Scorza's jeopardy. As evidenced by every argument and direct testimony made in these proceedings, Mr. Scorza earnestly believed that Davison was acting as a fiduciary who was going to aid him in achieving his longtime hopes and dreams. But unfortunately, Mr. Scorza was sorely mistaken because Davison led Mr. Scorza to believe it was acting in his interest, instead of advancing Mr. Scorza's objective of taking his invention to market.

Fourth, the consequence of imposing such a duty upon Davison to file a U.S. Provisional Patent Application c*ompetently and successfully* is neither unreasonable nor unduly burdensome where Davison itself contractually adopted not only the duty to file the application but undertook the corresponding obligation to accomplish that duty proficiently and correctly. While Davison could have just as easily placed the onus to file upon Mr. Scorza across its plethora of agreements' many sections of consents, mutual understandings and commitments, it did not. The present action seeks to merely hold Davison to its own self-imposed duty.

Finally, finding that an affirmative duty undoubtedly exists, and Davison is in breach thereof, serves the overall public interest by discouraging negligence among operators in the "invention help" space. Generally, by directly focusing on the actions of Davison and Davison's malfeasance, specifically, while not requiring any more of them than what was contractual bargained for or that which is required of the reasonable concern faced with foreseeability of harm in a tort paradigm applicable to all. Moreover, the unfair harm of taking one's hard-earned dollars, over twenty thousand of Mr. Scorza's dollars, with no results and no intention of ever satisfying Davison's contractual obligations screams that a solution be implemented to protect the overall public interest to ensure that society is not being robbed of their hard earnings or ingenuity.

The Supreme Court of Pennsylvania has observed that "[i]n scenarios involving an actor's affirmative conduct, he is generally 'under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." *Seebold v. Prison Health Services, Inc.*, 57 A.3d 1232, 1246 (2012) (quoting Section 302 cmt. A of the Restatement (Second) of Torts). The Court explained that "[t]his duty appropriately undergirds the vast expanse of tort claims in which a defendant's affirmative, risk-causing conduct is in issue." *Id.* Generally, there is no duty to protect or rescue someone who is at risk on account of circumstances the defendant had no role in creating. However, when Davison's affirmative conduct of entering into a contract to file a provisional patent application and taking the action to mail said application to the USPTO it created the risk of financial and property loss for Mr. Scorza, a duty to protect and rescue was created. *Dittman v. UPMC*, 196 A.3d 1036, 1046 (2018) (holding that UPMC owed Employees a duty to exercise reasonable care to protect them against an unreasonable risk of harm arising out of an act UMPC required as a condition of employment). Here it is the case that Davison enriched themselves by exciting Mr. Scorza's hopes and dreams with false and inducing words. Further, Davison was derelict in its duty to Mr. Scorza, mishandling documents of great legal consequence and importance to Mr. Scorza which placed Mr. Scorza in a legal jeopardy affecting his patent rights completely and indefinitely and subsequently failed to rescue Mr. Scorza from the peril that Davison created (with actual notice

thereof). Ultimately, Davison induced Mr. Scorza to spend thousands of dollars out of the funds intended to be invested in his grandson's education and to sustain the life of his medically disabled daughter, leaving Mr. Scorza in a worse shape and condition. Scorza Arb. Test., Feb. 18, 2023.

Having established the primary element of a negligence claim, that Davison owed Scorza a duty, it can now be established that Davison breached its duty to correctly file a provisional patent by failing to include the most basic product description with its first provisional patent filing, and then failing to write a mere five dollar check to the USPTO to ensure acceptance of the second provisional patent filed on Mr. Scorza's behalf. *But for* Davison's incomplete provisional patent filings and its failure to remedy any errors therein, Mr. Scorza would have been able to obtain a provisional patent on his invention and subsequent USPTO bestowed patent rights, per Scott McBride. Cl. 5 & 6.

Davison also breached its duty to keep Mr. Scorza's information confidential by disclosing details of Mr. Scorza's invention to third parties under the guise that the invention was "patent pending". R. 8; Cl. 13. *But for* Davison's disclosure of Mr. Scorza's information to third parties, Mr. Scorza's information would have remained confidential and would have remained in patentable condition. Cl. 41, Davison_000042 & Davison_000048.

Mr. Scorza's damages resulting from Davison's complete disregard for Mr. Scorza's most basic requirements of confidentiality, inquiries and pleas for assistance, which Davison chose to ignore while continuing to entice and cajole Mr. Scorza for his continued financial input, include a complete squandering of Mr. Scorza's ideas, as evidenced by the testimony of Scott McBride. The years and days and hours that Mr. Scorza spent developing his idea was all for naught, as Davison's failure to observe contractual duties has murdered Scorza's ability to <u>ever</u> regain those patent rights or earn $3.4 million over a 10-year period, as Dr. Lehrer testified to. Lehrer Arb. Test., Feb. 19, 2023. Davison has so carelessly and brazenly allowed Scorza's intellectual property rights, as well as his dreams, to inexplicably and inexcusably die, all in the name of greed and profit.

14

## IV.   CAUSES OF ACTION

### A.  Breach of Contract

Breach of Contract is established when there is: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and, (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 635 Pa. 427, 445, 137 A.3d 1247, 1258 (2016). Davison failed in its duty to uphold key sections of contracts drafted by Davison and entered into between Davison and Mr. Scorza.

Davison created its own contractual obligations to Mr. Scorza in the Pre-Development Agreement, as well as in the NPSA. (Cl. 48, Cl. 22). Davison's contractual obligation to file a Provisional Patent Application on behalf of Mr. Scorza was breached when it failed to use any due care to competently and correctly file Scorza's provisional patent on two separate occasions. Cl. 5 & 6. Likewise, Davison's contractual obligation to provide a physical prototype of Mr. Scorza's invention, along with packaging, was breached when Davison failed to deliver on its promises – which were essential terms of the NPSA. R. 7. After pocketing Mr. Scorza's money, Davison could not successfully file a provisional patent and only provided Scorza with a mere computerized rendering of the Trava-Weigh. Cl. 13. The breached promises are essential terms of each respective contract, the breach thereof resulting in irreparable damage to Mr. Scorza's intellectual property rights. McBride Arb. Test., Feb. 18, 2023.

### B.  Common Law Fraud

Common Law Fraud requires (1) a misrepresentation; (2) a fraudulent utterance of it; (3) the maker's intent that the recipient be induced thereby to act; (4) the recipient's justifiable reliance on the misrepresentation; and (5) damage to the recipient proximately caused. *Lokay v. Lehigh Valley Co-op. Farmers, Inc.*, 342 Pa.Super. 89, 96, 492 A.2d 405, 408 (1985).

Davison made material and false representations to Mr. Scorza that Davison *could* and *would* assist Mr. Scorza with the entire process of developing and finalizing Scorza's unique invention for commercialization, and that Davison had the requisite training, knowledge, and acumen to do so. For example, Davison represented it would file the patent application with the fee, but could

not even observe its own deficiency in filing the first application, or observe its promise to simply pay the micro entity filing fee to the USPTO for Scorza's second provisional patent filing. R. 7; Cl. 48, Davison_000332; Cl. 6.  Davison made fraudulent misrepresentations with actual knowledge of these misrepresentations with the intent of inducing Mr. Scorza to pay Davison over several years. Relying on Davison's false promises to help develop and sell Mr. Scorza's idea, Mr. Scorza made numerous payments that ultimately were systematically collected solely for the gain of Davison and for very little to no benefit to Mr. Scorza. Davison acted on the lucrative incentive to misinform Mr. Scorza, consciously engaging in profitable nonaction, benefiting directly from purposefully ignoring Mr. Scorza, knowing that Mr. Scorza would rely upon these actions (and nonactions) which Mr. Scorza did trust - to his detriment. Resulting in Mr. Scorza losing his patent rights and profits from the sale of the Trava-Weigh. McBride Arb. Test., Feb. 18, 2023; Lehrer Arb. Test., Feb. 19, 2023.

Disturbingly, Scorza is not the only, or the first, victim of Davison's schemes. In 2006 the FTC, in conjunction with the Pennsylvania Attorney General's Office under the FTC's Telemarketing Sales Rule, obtained a ruling ordering Davison to pay $26 million dollars for exploiting inventors hoping to "build a better mousetrap" or in other words, improving the world with new technology. Cl. 20. However, these punitive measures were not enough to deter Davison from undertaking more and more predatory contractual relationships with hopeful inventors and dreamers by honing its deceitful practices. Unfortunately, these dreamers who are induced by Davison end up with ideas, which were once potentially profitable, now bereft of <u>any</u> worth.

### C.  Fraud By Concealment and Non-Disclosure/Omission

Under Pennsylvania law, a plaintiff may assert a fraudulent concealment claim when the defendant concealed or intentionally prevented the plaintiff from discovering material information. *LEM 2Q, LLC v. Guar. Nat. Title Co.*, 144 A.3d 174, 181 n. 10 (Pa. Super. 2016); *Woodward v. Dietrich¸* 548 A.2d at 311-16.

Davison, upon discovery of its deficit provisional patent filings, failed to disclose any information to Mr. Scorza. When Scorza reached out to Davison with questions regarding notices from the USPTO detailing the deficit patent filings, Davison intentionally avoided acknowledging Scorza's questions and instead pitched new contractual agreements to further ensnare Mr. Scorza in its money grabs. Cl. 5, 6, and & 12; R. 23; Scorz Arb. Test., Feb. 18, 2023. Mr. Scorza was therefore deprived of facts – or otherwise fed intentionally vague, obfuscated, and vainglorious information – which would have been required to make an informed decision. Davison, in willfully defrauding Scorza, did not qualify any of its incomplete representations, did not observe the contractual duty owed to Mr. Scorza, and failed to disclose facts basic to its transactions on at least four occasions—January 12, 2017, March 29, 2017, December 14, 2018, and December 19, 2018. Cl. 3, 7, 16, and 17.

### D.  Negligent Misrepresentation

Under Pennsylvania law, a claim of negligent misrepresentation requires proof of the following elements: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Bortz v. Noon,* 729 A.2d 555, 561 (Pa. 1999).

Davison negligently misrepresented that it would file a provisional patent application on Mr. Scorza's behalf. *See* Cl. 48, Davison_000332). This misrepresentation was material to the transaction at hand because Davison *required* a provisional application to be filed prior to communication with potential companies for licensing purposes. *Id*. This misrepresentation was made falsely with recklessness as to its truth because Davison knew of the importance of having a patent application on file with the USPTO, as evidenced by the requirement to obtain one prior to moving forward with its services. Davison had the requisite intent to mislead Scorza into relying on the misrepresentation because it required Scorza to adhere to this provision, otherwise Davison would not proceed. Scorza justifiably relied on Davison's misrepresentation, as evidenced by Mr. Scorza's adherence to the agreements through payments, because he wanted

his idea to succeed. Scorza was injured by this misrepresentation through the irreparable loss of his intellectual property rights.

Davison made further negligent misrepresentations that it would keep Mr. Scorza's information confidential. This misrepresentation was material to the transaction at hand because Scorza's information was disclosed to another party, which completely invalidated Scorza's patent rights. Davison had assured Scorza that his information would be confidential, proving that the misrepresentation was made with knowledge of recklessness as to its truth and with the intent to mislead Scorza into relying on it because otherwise Scorza would not have contracted with Davison. Mr. Scorza justifiably relied on the misrepresentation because he entered into the relationship with Davison on the belief that Davison would confidentially maintain his invention rights and keep them from entering the public domain. Once again, Scorza was injured by this misrepresentation through the irreparable loss of his intellectual property rights.

### E.  Fraud in the Inducement

Under Pennsylvania law, plaintiffs are required to prove the following elements in a claim for fraud in the inducement: (1) a representation; (2) material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to its truth; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury. *Broederdorf v. Bachelor*, 129 F.Supp.3d 182, 198 (E.D. Pa. 2015). Successfully pled, such contracts are voidable. *Giannone v. Ayne Institute*, 290 F.Supp.2d 553, 564 (E.D. Pa. 2003).

In terms of the material misrepresentations contained in the facts above, Davison did present material misrepresentations as to: (1) the quality of Davison's services, (2) Davison's licensing acumen, (3) Davison's understanding of Patents, (4) Davison's ability to competently and successfully file a US Provisional Patent Application, twice, (5) Davison's inability to discern the proper use of "Patent Pending", (6) Davison's understanding of confidentiality, (7) Davison's ability to hold confidential information confidential, (8) Davison's ability to procure and evidence a Non-Disclosure Agreement, (9) Davison's selectivity as to whom it offers

18

services, (10) Davison's genuine stake in the outcome of the invention and that royalties are a source of income, (11) Davison's fees being 99.999% tied to fees charged and not royalties, (12) Davison's track record, (13) Davison's success rate, (14) Davison-assisted products are many, (15) Davison-assisted products are profitable, (16) Davison has special company access, (17) Davison's ability to cut through "the red tape" and the "old boys' network, (18) Davison's "close working relationship" with companies, (19) the Executive Summary offering objectivity and "expert analysis" of the marketability of a product, (20) Davison not commenting on the potential success of a product through "red flag" and "green flag" language, and, most appropriate, (21) the necessity of Davison's services - all made falsely with actual knowledge of its falsity or recklessness as to its truth that intended to mislead Mr. Scorza, who justifiably relied upon such misrepresentations to his great disadvantage and irreparable harm, a loss of his patent rights and proposed market capture of around $3.45 million dollars over 10 years.

### F.  Common Law Negligence

The elements of a cause of action in negligence are as follows: (1) a duty recognized by law, requiring the actor to conform to a certain standard with respect to the injured party; (2) a failure of the actor to conform to that standard; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage to the interests of another. *Felli v. Com., Dep't of Transp.*, 666 A.2d 775, 777 (Pa. Commw. Ct. 1995).

Davison owed Scorza a duty to correctly file a provisional patent and keep Mr. Scorza's information confidential. These duties were breached when Davison failed to properly file provisional patent application on behalf of Mr. Scorza on <u>two</u> occasions and disclosed Scorza's confidential information to third parties during the VRPPs and VISs. *See* Cl. 41, Davison_000042 & Davison_000048. *But for* Davison's breach, Mr. Scorza would have been able to obtain an allowed U.S. patent and his information would have remained confidential until this point. Mr. Scorza's damages resulting from Davison's breach include a complete squandering of Mr. Scorza's ideas, as evidenced by the testimony of Mr. McBride and Dr. Lehrer.

19

### V.   PENNSYLVANIA UTPACPL

The legislative intent in enacting the Pennsylvania Unfair Trade Practices & Consumer Protection Law ("UTPCPL") was to enhance the protection of the public from unfair or deceptive business practices. *Gabriel v. O'Hara*, 368 Pa.Super. 383, 388 & n.6, 534 A.2d 488, 491 & n.6 (1987). The principle enhancements of pre-existing common law protections included the codification of a list of practices designated as "unfair or deceptive" and therefore "unlawful" (73 Pa .Stat. §§ 201–2, 201–3), authorization of the Pennsylvania Attorney General to take several specific types of action to protect the citizenry from such practices (73 Pa. Stat. §§ 201–3.1 to 201–9.1), and authorizing a private cause of action by private parties for treble damages in certain circumstances (73 Pa. Stat. § 201–9.2). The central underlying intent was fraud prevention, and the act must be construed liberally to effectuate that remedial intent. *See Commonwealth v. Monumental Properties*, 459 Pa. 450, 329 A.2d 812, 815–17 (1974); *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 393 Pa.Super. 339, 346, 574 A.2d 641, 644 (1990); *Gabriel v. O'Hara*, 534 A.2d at 491; *Culbreth v. Lawrence Miller, Inc.*, 328 Pa.Super. 374, 477 A.2d 491 (1984).

### A.   Applicability

The UTPCPL states that:

> Any person who purchases or leases goods or services **primarily for personal**, family or household **purposes** and thereby suffers any ascertainable loss of money or property, real or person, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act…

has standing to sue under the Act. 73 Pa. Stat. § 201-9.2(a) (emphasis added). The list of applicable purposes is a disjunctive one ("personal, family **or** household purposes"), indicating that the statute applies to all personal purchases, all family purchases, and all household purchases. Even a residential condominium association has been held to be a "person" under the statute, as it represents the individual owners. *Valley Forge Towers*, 393 Pa.Super. 339, 347-48, 574 A.2d 641, 645. For determination of "household purpose" applicability of the statute, the purpose of the purchase is the correct direction of analysis. In that case, if the "sole motivation"

*Defendant's Exhibit 7*

of the purchase is non-household, the purchase is non-household in nature. *Waldo v. N. Am. Van Lines, Inc.*, 669 F.Supp. 722, 726 (W.D. Pa. 1987).

All four contracts were entered into by Mario Scorza, individually. *See* R.3, 7, 16, & 17. None of the contracts were entered into by an entity, or even by Mario Scorza on behalf of, or for the benefit of, an entity. That the "services" were provided for Mario Scorza individually is simply not even in factual dispute. Furthermore, the applicant on both patent applications was Mario Scorza individually, not an entity. Cl. 5 & 6. The services were obtained for an individual, Mario Scorza, who individually contracted with Davison.

Davison has argued that its contract states that the services are not for personal use, and that boilerplate recitation in a consumer contract of adhesion insulates them for any liability under the UTPCPL. This is unsurprising, as it is essentially Davison's repeat argument, that its contracts protect them from all liability, no matter what they have done wrong. However, it is contrary to fact and unenforceable, as discussed in section VI, *infra*.

### B.  Violations

The statute presents a list prohibited conduct:

> "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:..
>
> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;…
>
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;…
>
> (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;…
>
> (xxi) *Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding*.

73 Pa. Stat. § 201-2(4)(*emphasis* on the catchall clause of the statute).

The various misrepresentations that were routinely made by Davison were discussed  at length in the *FTC* ruling.  Cl. 18.  Scorza confirmed that many of the same misrepresentations were made to him as well, albeit in slightly altered terms.  Scorza Testimony, Jan. 18, 2023.

However, Davison made several contractual misrepresentations and omissions that were ultimately fatal to Scorza's patent rights and account for the overwhelming majority of his damages: 1) it represented that it would "mail the [patent] application to the USPTO along with the micro entity filing fee, which is currently $65.00" Cl. 48, para. 6; 2) it failed to notify him that both his patent applications were in mortal danger, due it its own mistakes and malfeasance; 3) it represented that it would keep Scorza's valuable invention confidential, when it was actually sending out his invention details without signed non-disclosure agreements, resulting in the loss of all of his patent rights. These misrepresentations and complete malfeasance doomed Scorza's patent.

### C.  Strict Liability

Violations of the UTPCPL do *not* require intent to deceive, or even negligence, for liability to attach.  As the Pennsylvania Supreme Court has made abundantly clear, the UTPCPL is a strict liability statute.

> "A plain language analysis of the relevant statutory provision leads inexorably to the conclusion that deceptive conduct under the CPL [UTPCPL] is not dependent in any respect upon proof of the actor's state of mind. The Superior Court's holding is consistent not only with the plain language of the CPL [UTPCPL], but also with our precedent holding that the CPL [UTPCPL] is a remedial statute that should be construed broadly in order to comport with the legislative will to eradicate unscrupulous business practices."

*Gregg v. Ameriprise Finan., Inc.*, 245 A.3d 637, 641, 2021 WL 607486 (Pa. Feb. 17, 2021), *citing Commonwealth by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974).

The Pennsylvania Supreme Court held:

> "[A]ny deceptive conduct, "which creates a likelihood of confusion or of misunderstanding," is actionable under 73 P.S. § 201-2(4)(xxi), whether committed intentionally (as in a fraudulent misrepresentation), carelessly (as in a negligent misrepresentation), or with the utmost care (as in strict liability).

Whether a vendor's "conduct has the tendency or capacity to deceive ... is a lesser, more relaxed standard than that for fraud or negligent misrepresentation." *TAP*, 36 A.3d at 1253. The only thing more relaxed than negligence—regarding a consumer's burden of proof—is strict liability."

*Gregg*, 195 A.3d at 939 [the Superior Court opinion].

"Like other strict liability offenses, liability for deceptive conduct under the CPL cannot be excused if consumers rely upon that conduct to their financial detriment. Representations made in the consumer context are within the exclusive control of the vendor:

[A commercial transaction] occurs in a designed setting entirely of the vendor's own creation via preplanned marketing schemes. Thus, vendors place themselves, by choosing where, when, and how they enter the market, in a much stronger position to comply fully with the [CPL] before soliciting or interacting with consumers. Vendors not only elect whether to enter a market, but, because "the market" is a fictional place, they have full volitional control over their conduct when in it.

The [CPL] is for consumer protection. It undoes the ills of sharp business dealings by vendors, who, as here, may be counseling consumers in very private, highly technical concerns. Like the Greggs, those consumers may be especially reliant upon a vendor's specialized skill, training, and experience in matters with which consumers have little or no expertise. Therefore, the legislature has placed the duty of [CPL] compliance squarely and solely on vendors; they are not to engage in deceitful conduct and have no legally cognizable excuse, if they do."

*Id*. at 939-40.   It is the vendor—not the consumer—that is charged with complying with the CPL, as the vendor is in a better position to determine whether the representation might be deceptive. Strict liability for such violations is consistent with the legislative mandate to eradicate the use of unfair and deceptive conduct in consumer transactions. *Monumental*, at 815-16.

*Gregg v. Ameriprise Finan., Inc.*, 245 A.3d 637, 650 (the Pa. Supreme Court Opinion), *citing Commonwealth v. TAP Pharm. Products, Inc*., 36 A.3d 1197 (Pa. Cmwlth. 2011), *rev'd on other grounds*, 626 Pa. 1, 94 A.3d 350 (2014); *Gregg v. Ameriprise Finan.*, 195 A.3d 930, 936 (Pa. Super. 2018)(the Superior Court Opinion); *Commonwealth by Creamer v. Monumental Props., Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974).

Davison will argue that it intended to correctly file the patent application.  It failed to file the first application correctly, resulting is loss of original filing date. It fumbled the ball yet another time by including the wrong fee (the fee had increased recently), and failing to ever send

in the additional $5.00 that could have saved the application.  Davison might argue that its state of mind was merely negligent during this sorry comedy of errors.  However, it does not matter. Davison may have meant well, may have done it intentionally, or had no state of mind whatsoever, because it was so painfully clueless.  **However, it simply does not matter. Davison is liable as a matter of law under the statute.**

### D.  Damages & Trebled Damages

The UTPCPL permits plaintiffs to recover for "any ascertainable loss of money or property, real or personal."  73 Pa. Stat. § 201-9.2.

The Court found, as a matter of statutory construction, that a trial court's discretion to award treble damages under the UTPCPL should not be closely constrained by the common law requirements for punitive damages.  *Schwartz v. Rockey*, 593 Pa. 536, 557, 932 A.2d 885, 898 (Pa 2007).  A "consumer protection statute requiring awards of treble damages for violations is, in effect, a hybrid, with both punitive and remedial aspects, and therefore,…" "common-law requirements governing the award of punitive damages should not control."  *Schwartz*, 593 Pa. at 557, *citing Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397, 402 (1981).  The Pennsylvania Supreme Court holds that treble damages in UTPCPL cases should be awarded *more generously* than punitive damages.  A trial court may consider intentional or reckless wrongful conduct for which an award of treble damages would be remedial in nature when deciding whether to award treble damages.  *Schwartz*, 593 Pa. at 557.  No finding of outrageous conduct is needed for an award of trebled damages.  *Gadley v. Ellis*, Civ. No. 3:13-17, 2016 WL 1090654, at *3, 2016 U.S. Dist. LEXIS 35252 (W.D. Pa. Mar. 18, 2016)(*citing Schwartz v. Rockey*, 932 A.2d at 898; *see also Lindsley v. Am. Honda Motor Co.*, Civ. No. 16-941, 2017 WL 2930962, at *9-10 (E.D. Pa. Jul. 7, 2017)).  Under the UTPCPL, rather than punitive damages, the trial court has purely discretionary authority to award treble damages.  *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 401 (3d Cir. 2004). Here, the Tribunal has full authority and discretion to award treble damages to punish, as a matter of public policy, Davison's intentional and reckless wrongful conduct and is requested to do so.

Davison argues that Scorza's claims are barred under the "gist of the action" doctrine, that contractual duties cannot serve as the base for a tort claim, and that any tort claim is subsumed within a breach of contract claim.   *See* Respondent Pre-Hearing Brief, p. 5-6. However, the Pennsylvania Supreme Court held that the economic loss doctrine does not apply to UTPCPL claims.  Pennsylvania does not apply the economic loss doctrine where there is a "'statutory [as opposed to common law] basis to impose liability for economic losses." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 604 Pa. 50, 985 A.2d 840, 842-43 (2009); *see also Earl v. NVR, Inc.*, 990 F.3d 310, 313 (3rd Cir. 2021); *Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. Ct. 2013).   "The UTPCPL does just that. It permits plaintiffs to recover for 'any ascertainable loss of money *or* property, real or personal.'  73 Pa. Cons. Stat. § 201-9.2 (emphasis added)."   *Earl*, 990 F.3d at 313 (citations and emphasis in original).  The damages for Scorza's loss of all his patent rights are fully recoverable under the UTPCPL.

## VI.    CONTRACTUAL DISCLAIMERS OF LIABILITY

Davison attempts to rely upon a boiler plate contractual provision to escape all potential liability whatsoever.  Davison argues that the clause in question is a "limitation of damages" clause, citing no authority and making no legal arguments.  However, clauses that purport to contractually limit damages are exculpatory clauses by definition.  The legal test applies to any "exculpatory language."  *Tayar v. Camelback Ski Corp., Inc.*, 616 Pa. 385, 47 A.3d 1190, 1196 (2012); *Topp Copy Products, Inc. v. Singletary*, 533 Pa. 468, 471, 626 A.2d 98, 99 (Pa. 1993). The clause simply states that "In no event will Davison be liable to Client for any consequential, exemplary, incidental or punitive damages, including lost opportunities or lost profits."  The clause purports to exculpate Davison for any consequential or incidental damages, including lost profits.  It also purports to exculpate against exemplary and punitive damages.

This begs the question, what other damages would there be flowing out of a contract of this nature?  The breach of a contract to develop an invention would only involve consequential or incidental damages, and possibly lost profits.  There are no other kinds of damages, other than those which have been purportedly disclaimed.  The clause is clearly an exculpatory clause and is disfavored at law.

"Those clauses are disfavored and must meet certain conditions to be enforceable. First, the clause must not contravene public policy. Second, the contract must relate solely to the private affairs of the contracting parties and not include a matter of public interest. Third, each party must be a free bargaining agent. In addition, an exculpatory or indemnity clause will still not be enforced unless it is clear that the beneficiary of the clause is being relieved of liability only for his/her own acts of negligence. The clause must be construed strictly and the contract must state the intention of the parties with the greatest particularity. Furthermore, any ambiguity must be construed against the party seeking immunity, and that party also has the burden of proving each of the prerequisites to enforcement."

*Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195 (3rd Cir. 1995), *citing Topp Copy*, 626 A.2d at 99. Furthermore, the burden of establishing immunity is upon the party invoking protection under such a clause. *Tayar*, 47 A.3d at 1196.

The law "abhors forfeitures and penalties and enforces them with the greatest reluctance when a proper case is presented." *Acme Markets, Inc. v. Federal Armored Exp., Inc.*, 437 Pa.Super. 41, 48, 648 A.2d 1218, 1221 (1994), *quoting Fogel Refrigerator Co. v. Oteri*, 391 Pa. 188, 195, 137 A.2d 225, 231 (1958).

As Davison readily concedes, and indeed affirmatively argues, the clause purports to exculpate Davison from any liability whatsoever. However, clauses that exculpate liability for gross negligence and higher levels of fault are void and against Pennsylvania public policy. *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 20-21 (Pa. 2019), *citing Tayar*, 47 A.3d at 1203. By Davison 's own arguments, the clause is void as against public policy. The clause is unenforceable.

The clause also involves a matter of public interest. As discussed, *supra*, the Texas Invention Development Services Act requires specific disclosures as to the success rate of the development services. The disclosures were false and conflicted with those made on Davison's website. As discussed, Davison's success in developing inventions was vanishingly small. Davison's failure to make statutory disclosures involved a matter of public interest. Furthermore, Pennsylvania has expressed public interest through the passage and recent

expansion of the UTPCPL into a strict liability standard. Accordingly, the exculpatory clauses are unenforceable.

The clause fails to address and does not explicitly disclaim any liability flowing out of its own negligence, gross negligence, recklessness, or intentional acts.  To be enforceable, "the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties," that is to say, the clause must specifically establish which conduct is being disclaimed from liability.  *Tayar*, 47 A.3d at 1196; *Topp Copy*, 626 A.2d at 99.  The clause simply states the "The liability of the parties for any and all claims…" is limited.  The clause fails to specify which levels of fault and what kinds of behavior are being disclaimed.  The text of the language lacks any semblance of "greatest particularity," puts nothing "beyond doubt by express stipulation," and contains absolutely nothing but "words of general import."  As such, the clause fails to meet the test for enforceability under Pennsylvania law.  The clause is unenforceable.

Finally, Davison carries the burden of proof to establish that the exculpatory language is enforceable under Pennsylvania law, a burden that Davison does not and cannot meet.  The clauses are simply unenforceable.

In Pennsylvania, exculpatory clauses are invalid under three conditions: "First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion." *Topp Copy*, 626 S.2d 98,99 (Pa. 1993).

"An adhesion contact is defined as a standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms." *Lytle v. CitiFinancial Servs., Inc.*, 810 A.2d 643, 658 (Pa. Super. 2002).  When a party has no knowledge of the applicable industry, no chance to negotiate the terms of the contract, and no choice but to accept the terms and conditions, the terms become unenforceable terms of exculpatory adhesion.  *Id*.

In addition to terms being unlawful exculpatory clauses, the terms are also unconscionable and void.  In Pennsylvania, "a contract or term is unconscionable, and therefore

avoidable, where there is a lack of meaningful choice in the acceptance of the challenged provision [procedural unconscionability], and the provision unreasonably favors the party asserting it [substantive unconscionability].   *Salley v. Option One Mortgage Corp.*, 925 A.2d 115 (2007).  The highly vaunted contractual disclaimers of liability are also unconscionable and void.

## VII.    DAMAGES

Davison's breach of contract, torts, and violations of the UTPACPL led to the loss of Scorza's most valuable asset, his eminently patentable invention.  His damages are the value of the botched patent that can never be recovered, $3.4 million over a 10-year period.

Dr. Kenneth Lehrer, in his oral testimony and in his Initial Expert Report, testified that the best way to value lost patent rights is through a model business enterprise, producing and selling the invention.  Cl. 38, p. 4, 8-10.  Dr. Lehrer refers to the enterprise model also as "The Theory of the Firm."  *Id*., p. 8-10.  "The value of the firm is the present value of the firm's expected future net cash flows."  *Id*., p. 9.

Dr. Lehrer testified that, twenty-five (25) years ago, the most appropriate business enterprise model for a patent or invention would be a firm that sold the product in retail brick and mortar establishments.  However, due to the internet retail revolution, the most typical business enterprise model today for a consumer good is to produce the good in China, or a similar low-cost location, and to sell them through an online retail platform, such as Amazon.

Typically, a future or hypothetical business is valued by means of a sensitivity analysis, also known as a Monte Carlo analysis.  A sensitivity analysis is a variation on a set of scenarios or the process of varying model input parameters over a reasonable range (range of uncertainty in values of the model's parameters) and observing the relative change in the model's response. Typically, a business would be simulated by comparing several market share captures, typical for new businesses in the industry, and the size of the market for the industry.  Dr. Lehrer testified that this method is often used for merger or acquisition fairness opinions when target companies feature a new product.  It is also used and found reliable in SEC filings, particularly those featuring forward-looking statements.  Dr. Lehrer testified that he has previously performed

Monte Carlo analyses that have been in use in merger and acquisition fairness opinions and SEC filings.  Monte Carlo analyses are admissible under the Federal Rules of Evidence and have been found to satisfy the *Daubert* test.  *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 293-94 (5th Cir. 2010).

Dr. Lehrer testified that the personal scales market is a growing market in the United States and is currently valued at $670 million per year.  Typical conservative market captures for new products in the consumer goods market would run in the 0.08% to 0.12% of the market.  A price per unit in the $20-25 range would be appropriate for the new product, based on similar competitive products.

Dr. Lehrer testified that he consulted with Amazon Co., as well as with a customs broker and import-export attorney to appropriately model costs and expenses for his business enterprise model.  He accounted for: cost of goods sold, manufacturing fees, an Amazon 10 year Retailer Plan; Amazon's commission per unit sold; container costs for import; harbor maintenance fees; tariffs; warehouse transport costs; Customs goods examination costs, customs brokerage fees; yearly import bond; demurrage; inspection fees; insurance; and miscellaneous costs.  Applying these expenses, Dr. Lehrer found the cost of goods sold in the 15% range, and the costs and expenses in the 30-33% of revenues, resulting in profits in the 47-50% of revenue range.

Simply applying Dr. Lehrer's proposed market capture numbers lead to some proposed scenarios.  A low range capture of 0.08% of the $670 million per year market would lead to revenues of $536,000/year.  Over a 10-year product life cycle this would represent around $2.5 million in lost profits.  As Dr. Lehrer testified, he would not account for inflation, so as to not necessitate a discount to present value analysis.

Similarly, a mid-range number of market capture of 0.10% would lead to yearly revenues of $670,000, and total lost profits around $3.7 million.  A high range market capture of 0.12% would lead to yearly revenues of $804,000, and total lost profits of around $4.1 million.  Averaging these values leads to a patent valuation of around $3.45 million.  Weighted averages could also be calculated.

Scorza also seeks a return of the money that he paid to Davison in the amount of $21,042.25.  *See* Cl. 48, Idea Submission Agreement ($795.00); Cl. 11, New Product Sample Agreement ($14,757.25); Cl. 44, Inventomercial Agreement ($1495.00); Cl. 49, MCC Agreement ($3,995.00).

## VIII.   CONCLUSION

Davison deceived a man in his late 70's, relentlessly selling him useless contracts, sucking dry his life savings, which were intended to benefit his grandson's college education and his disabled daughter.  Ultimately, even worse for him, they were utterly incompetent at even the relatively minimal tasks that they did set out to do.  Davison botched his first patent application by failing to include the fee or the supporting documents.  They then failed to include the proper fee with the second application.  The application could have been saved by means of forwarding a simple $5.00 check to the USPTO in order to correct the monumental error.  Davison simply never bothered

However, Davison was never really in the business of obtaining patent right or royalties for their inventors.  Davison is in the business of selling contracts, from which it derives essentially all of its revenue.  When Scorza repeatedly begged Davison's help for what to do in response to repeated notices from the USPTO, Frank Vescio, whose motto was clearly "always be closing," ignored his requests and sold him two more useless contracts, sucking a few more thousand dollars from the hapless Scorza.  Meanwhile Scorza's patent application, and all his rights, died at the USPTO due to Davison's reckless disregard and utter malfeasance.

Claimant requests this Tribunal to restore the value of Scorza's lost patent rights. Claimant requests any and all other relief, either at law or in equity, to which he may show himself justly entitled.

Defendant's Exhibit 7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on the following parties and/or counsel pursuant to the applicable procedure on this 3rd day of March, 2023.

Scott D. Livingston
Sharon Durkin
George Crompton
Justin T. Barron

*/s/ Stacey L. Barnes*
Stacey L. Barnes